UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JOHN DOE,<br><br>      *Plaintiff*,<br>v.<br><br>THE TRUSTEES OF BOSTON COLLEGE,<br><br>      *Defendant*. | **CIVIL ACTION NO. 23-12737-ADB** |

**PLAINTIFF'S MEMORANDUM IN SUPPORT OF HIS
MOTION TO PROCEED UNDER PSEUDONYM**

Plaintiff, pseudonymously referred to herein as "John Doe," respectfully submits this memorandum of law in support of his Motion to Proceed Under Pseudonym (the "Motion"). In light of the sensitive nature of Plaintiff's allegations, the fact that, to date, they have been treated as confidential, and that, by the Parties' Agreement, the details of Plaintiff's allegations against BC officials and Plaintiff's student disciplinary record supposed to be kept confidential, Plaintiff requests the Court grant his request to proceed under a pseudonym.

  **I.  BRIEF SUMMARY OF ALLEGATIONS IN THE COMPLAINT[1]**

Plaintiff was a student at Boston College ("BC" or "Defendant") from 2016-2020. While a student at BC, Doe was diagnosed with social anxiety, which made it difficult for him to develop friendships and engage in healthy social interactions with fellow BC students. Plaintiff requested accommodations from BC that would have allowed him to achieve academic success despite his condition. During Doe's freshman year, he alleges that he got into an altercation with

---

[1] For purposes of this summary, Plaintiff generally summarizes the allegations in the Complaint. In this summary, Plaintiff leaves out any identifying information of those involved and other details that could inadvertently disclose any individual's identity.

1

his roommate, who, while drunk, shoved Plaintiff and called him a "non-human." Despite the involvement of the BC Police Department and Plaintiff stating that he wanted to pursue criminal charges against his roommate, when BC learned of the incident, it tried to downplay it and requested BCPD not pursue criminal charges. Also during Plaintiff's freshman year, after asking one of his professors for a letter of recommendation, the professor instructed Plaintiff to meet him in his office. While they were alone in the office, the professor forced Plaintiff to engage in sexual activities in exchange for the letter of recommendation. Plaintiff did not immediately report these incidents because he feared the consequences of making such accusations.

      During Plaintiff's third year, another professor began acting as Plaintiff's mentor. Eventually, they began meeting on a weekly basis. His mentor encouraged Plaintiff to seek out mental health services from the University Counseling Services ("UCS"). His mentor even accompanied him to the his first appointment; however, as he was signing up for services, he was encouraged to sign a release allowing his mentor to access his private medical records, which Plaintiff signed despite his reservations about providing a professor access to such personal information.

      During one conversation, Plaintiff disclosed that a professor had sexually abused him during his freshman year. Rather than provide Plaintiff support, Plaintiff's mentor told him that he was violating personal boundaries by trying to become friends. His mentor then began excluding Plaintiff from educational opportunities and social activities she was offering other students. Plaintiff's relationship with his mentor significantly deteriorated during the remainder of his time at BC. Their weekly meetings ceased and his mentor was given additional teaching duties that increasingly made it difficult for Plaintiff and his mentor to meet, and reduced the amount of time and support she could offer Plaintiff.

Upset at losing his mentor, Plaintiff attempted to learn why she had been given additional teaching duties and who he could speak to about how the loss of his mentor was affecting him. Plaintiff was haled to a meeting with another professor, who proceeded to belittle Plaintiff's social anxiety diagnosis, berated Plaintiff for an hour about how he was acting inappropriately, and called him a stalker. Plaintiff was told he could not speak to his mentor for the rest of the semester and told him he would be reported to BCPD if he did. Apparently at the behest of this other professor, Plaintiff's former mentor filed a police report against him that included several false statements and allegations. Despite these falsehoods, BCPD determined that no crime had been committed. The stress of this incident caused Plaintiff to become depressed and suicidal. After he wrote, and quickly retracted a suicide note, UCS staff insisted Plaintiff be taken to the hospital for evaluation. While at the hospital, BC served Plaintiff a stay away/no contact order.

Plaintiff then began meeting with an official from the Dean of Students Office. Plaintiff became increasingly uncomfortable during these meetings, which led Plaintiff and later his mother, to tell the official that Plaintiff no longer wanted to meet with him in-person. For instance, Plaintiff alleges that during one conversation between this official and Plaintiff's mother, the official indirectly inquired about Plaintiff's sexual orientation four times.  Around the same time, BC alleged that Plaintiff violated the stay away/no contact order and scheduled a disciplinary hearing. Prior to the hearing, the official from the Dean of Students Office sought out Plaintiff and asked him to go to his office. Plaintiff refused. While discussing the upcoming hearing, the official placed his hand on Plaintiff's inner thigh and kept it there for the remainder of the conversation. Plaintiff filed a Title IX complaint shortly after this incident. After Plaintiff filed this complaint, BC accused Plaintiff again of violating the stay away/no contact order and ordered him to stay off campus entirely.

Before the disciplinary hearing could take place, BC and Plaintiff negotiated an agreement (the "Agreement"). The Agreement required Plaintiff to withdraw each of the Title IX complaints and grievances about BC failing to provide reasonable accommodations that he filed against BC officials and employees. In return, BC agreed to dismiss all pending disciplinary charges against Plaintiff and to expunge the pending charges from his student record, including any related records from its database. Further, BC agreed that Doe's disciplinary record would only reflect an April 30, 2019, incident described as Doe's failure to comply with a university directive. BC specifically agreed not to disclose the allegations related to the dismissed and expunged charges and, if any third party requested information concerning Doe's conduct record, BC agreed that it would only say that Doe "was found responsible for failure to comply with a university directive and completed one semester of university probation."

In August 2020, applied to various medical schools. Plaintiff's mother was a member of one of the school's faculty and had previously served on its admissions committee for four years. In February of 2021, Plaintiff was surprised to learn that the admissions committee for this particular school had rejected his application. Plaintiff's mother learned that the primary reason for the committee decision was "a red flag on the BC portion of Doe's application." Essentially, the committee had been provided information that violated the terms of the Agreement. For instance, Plaintiff alleges that the committee was told that his April 30, 2019, conduct violation was the result of multiple instances of Doe breaking the rules despite multiple warnings, which "became a concern" to the committee. Plaintiff's mother was told that the committee received information about Doe's disciplinary history at BC and that the issues were more significant than previously described and that Plaintiff had been suspended by BC.

Plaintiff again applied to medical schools during the following admissions cycle, but was

4

again rejected. In his Complaint, Plaintiff claims that BC had, again, provided the admissions committee information about his disciplinary record in violation of the Agreement.

## II. LEGAL STANDARD FOR ALLOWING PLAINTIFF TO PROCEED UNDER PSEUDONYM

When ruling on a motion to allow a party to proceed under pseudonym, a district court should balance the movant's interests asserted in remaining private against the public interest in transparency. See Doe v. Mass. Inst. of Tech., 46 F.4th 61, 73 (1st Cir. 2022) (hereinafter "MIT"). To proceed under a pseudonym, the moving party bears the burden of rebutting a strong presumption against pseudonymity. See id. In MIT, the First Circuit outlined four general paradigms for which anonymity is ordinarily warranted, including: when (1) the plaintiff "reasonably fears that coming out of the shadow will cause him unusually severe harm (either physical or psychological); (2) "identifying the would-be Doe would harm innocent non-parties;" (3) "anonymity is necessary to forestall a chilling effect on future litigants who may be similarly situated;" and (4) in "suits that are about un with a prior proceeding made confidential by law." Id. 71-72. Particularly relevant here, the First Circuit held that the "public has an abiding interest in ensuring that the values underpinning the confidentiality protections imposed by FERPA and Title IX are not subverted by collateral attacks in federal courts." Id. at 76. In most cases, the district court's analysis will focus on whether the asserted fact align with one of these paradigms. See id.

## III. LEGAL ARGUMENT

Doe should be allowed to pursue his Complaint under a pseudonym because the facts involved in his case and the allegations set forth in his Complaint fit neatly in three of the four general paradigms described by the First Circuit in MIT. Doe focuses his argument on those three categories of cases below.

**A. Revealing Doe's Identity Would Cause Severe Harm**

Requiring Doe to disclose his identity publicly would cause him harm. In fact, requiring him to publicly disclose his identity would cause Doe to suffer the exact harm that he sought to avoid when he entered into the Agreement with BC. Doe decided to drop his various Title IX, retaliation, and accommodation complaints against BC and various BC employees in return for BC's agreement not only to drop pending student disciplinary charges, but also to ensure that BC would not disclose those allegations to third parties. If Doe were required to identify himself in his Complaint, then the unproven allegations of disciplinary misconduct would necessarily also become public, undermining the purpose of the Agreement. That is exactly what Doe was trying to avoid and what BC agreed to do. It would render his agreement with BC meaningless. When Doe chose not to pursue his various complaints against BC, BC received the benefit of the bargain immediately. Doe continues to pursue his higher education goals and intends to reapply to medical schools in the near future. He would be harmed if the details of his medical diagnosis, reports of sexual harassment and assaults, and unproven disciplinary allegations were publicly available to members of admissions committees in the future.

**B. Anonymity For Doe Is Necessary To Prevent A Chilling Effect On Similarly Situated Potential Future Litigants**

In MIT, the First Circuit explained that courts must consider and be wary of the chilling effect that can result from denying a plaintiff the opportunity to litigate claims anonymously. Examples of these types of cases identified by the First Circuit include matters "involving 'intimate issues such as sexual activities, reproductive rights, bodily autonomy, medical concerns, or the identity of abused minors.'" MIT 46 F.4th at 71 (quoting In re Sealed Case, 971 F.3d 324, 327 (D.C. Cir. 2020)). Included amongst these types of cases are those in which "'the injury litigated against would be incurred as a result of the disclosure of the [party's] identity[.]'"

6

Id. (quoting Doe v. Frank, 951 F.2d 320, 324 (11th Cir. 1992)).

The removal of confidentiality in this case would have a chilling effect on future litigants and students who are victimized by unwanted sexual advances and assaults. "The public has an abiding interest in ensuring that the values underpinning the confidentiality protections imposed by FERPA and Title IX are not subverted by collateral attacks in federal court." MIT, 46 F.4th at 76. The Circuit recognized that disclosure of student identities in litigation may act as a deterrent from future students participating in reporting abuse or participating in the university disciplinary process. Id.

### C. The Underlying Proceeding Received Confidential Treatment

The final category of cases identified by the First Circuit are those in which prior proceedings that are confidential by law are bound up with the present litigation. Specifically in MIT, the First Circuit noted that pseudonymity may be appropriate where, as here, the allegations involved Title IX disciplinary proceedings that are treated as confidential as a matter of law. See MIT, 46 F.4th at 74. The First Circuit cited various federal laws and regulations providing for the confidentiality of university disciplinary proceedings. See Title IX proceedings governed by Department of Education regulation 34 C.F.R. pt. 106, 20 U.S.C. § 1092(f)(8)(B)(iv) and 34 C.F.R. § 668.46(k), and FERPA, 20 U.S.C. § 1232g. "Student disciplinary records typically call under this protective carapace." MIT, 46 F.4th at 74 (citing United States v. Mia Univ., 294 F.3d 797, 812 (6th Cir. 2002)). The MIT Court specifically rejected the argument that a plaintiff automatically forfeits the confidentiality protections of Title IX and FERPA by bringing suit. Id. at 75.

Undoubtedly, the underlying proceedings here were treated as confidential. BC was required to treat Doe's Title IX complaints and proceedings as confidential. 34 C.F.R. pt. 106, 20

7

U.S.C. § 1092(f)(8)(B)(iv) and 34 C.F.R. § 668.46(k). BC is also required to keep Doe's student disciplinary record confidential. 20 U.S.C. § 1232g. By inserting various restrictions on the further dissemination of information about Doe's grievances and his alleged misconduct, the Parties recognized at the time they executed the Agreement that it was important to maintain the confidentiality of Doe's complaints and his student disciplinary record. Granting Doe pseudonymity maintains the current status quo and preserve the confidential nature of BC's administrative process. If Doe were required to disclose his identity, it would upend that status quo.

D. **BC Is Aware Of Doe's Identity And It Will Not Be Prejudiced By Plaintiff's Use Of A Pseudonym And Remaining Anonymous To The Public**

BC will have a full opportunity to defend itself against Doe's allegations and, if Doe is permitted to pursue his claims under a pseudonym, it will not prejudice BC. Counsel for Doe and BC have previously discussed these allegations set forth in Doe's complaint and BC's counsel knows Doe's identity.[2] Most recently, counsel have discussed this matter and filed a joint motion to temporarily impound the complaint and to establish a briefing schedule. That fact that BC will not be prejudiced is another factor favoring pseudonymity. See Sealed Plaintiff v. Sealed Defendant, 537 F.3d 185, 189 (2d Cir. 2008) (anonymity balanced against public interest and prejudice to defendant). The same can be said for the fact that Doe is not requesting the entire case be sealed and hidden from the public. Doe's request is narrowly tailored to withhold a limited amount of information from the public, while the nature of the allegations, legal rulings, and the proceedings will remain open to the public. See Doe v. Purdue Univ., 321 F.R.D. 339, 342 (N.D. Ind. 2017). Finally, even before the First Circuit adopted the standard announced in its MIT decision, district courts within the circuit regularly permitted plaintiffs to proceed under a

---

[2] If the Court grants Doe's Motion, Doe would not object to disclosing his identity to the Court under seal.

8

pseudonym when the underlying dispute involved breach of contract claims stemming from Title IX investigation. See e.g., Doe v. Stonehill Coll., 55 420 U.S.C. § 1232gh 302 (1st Cir. 2022) (remanding breach of contract claim to district court); Doe v. Harvard Univ., 462 F. Supp. 3d 51 (D. Mass. 2020) (denying motion to dismiss breach of contract claim); Doe v. Trustees of Boston College, 942 F.3d 527 (1st Cir. 2019); Doe v. Trustees of Boston College, 892 F.3d 67 (1st Cir. 2018).

## IV.　CONCLUSION

The facts set forth in Doe's complaint demonstrate the need for him to remain anonymous and justify his request to pursue this litigation under a pseudonym. The facts involved in the instant action neatly fall within the general paradigms the First Circuit described as usually satisfying the plaintiff's burden of demonstrating a need for anonymity. See MIT, 46 F.4th at 71-72. Doe's breach of contract claim directly involves complaints he made against BC employees for sexual misconduct, sexual assault, discrimination, and retaliation, as well as his student disciplinary record. Both the Title IX complaints and Doe's student disciplinary record are required to be treated as confidential, at least by BC. Doe's grievances, particularly those of a sexual nature, are highly sensitive and private in nature. The Parties recognized the sensitive nature of these allegations when they executed the Agreement.

Therefore, Plaintiff requests the Court grant his Motion to Proceed Under Pseudonym.

Respectfully submitted,

JOHN DOE,

By his Attorney

/s/ *Tristan P. Colangelo*
Tristan P. Colangelo (BBO# 682202)
Kerstein, Coren & Lichtenstein, LLP
60 Walnut Street, 4th Floor
Wellesley, MA 02481
781-997-1600
tcolangelo@kcl-law.com

Dated: November 22, 2023

## CERTIFICATE OF SERVICE

I, Tristan P. Colangelo, hereby certify that a true copy of the above document was served electronically upon all attorneys of record for each other party on November 22, 2023, as a registered ECF participant.

/s/ *Tristan P. Colangelo*
Tristan P. Colangelo