UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| JOHN DOE, | ) | |
| | ) | |
| *Plaintiff*, | ) | |
| | ) | Civil Action No. 23-12737-ADB |
| v. | ) | |
| | ) | |
| TRUSTEES OF BOSTON COLLEGE, | ) | |
| | ) | |
| *Defendant*. | ) | |

**DEFENDANT TRUSTEES OF BOSTON COLLEGE'S**
**MEMORANDUM IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

Alan D. Rose (BBO # 427280)
Meredith Wilson Doty (BBO # 652220)
Daniel M. Lee (BBO # 703616)
ROSE LAW PARTNERS LLP
One Beacon Street, 23rd Floor
Boston, Massachusetts 02108
Tel: (617) 536-0040
Fax: (617) 536-4400
adr@rose-law.net
mwd@rose-law.net
dml@rose-law.net

*Counsel for Trustees of Boston College*

Medical school admissions are highly competitive.  In any given year, the number of medical school applicants dramatically exceeds the number of available spots at medical schools.  To secure admission, applicants must demonstrate not only excellent grades and standardized test scores, but also evidence of patient-facing clinical experience and volunteer work in their community. Applicants are further assessed based on their essays and letters of recommendation. Medical school applicants must interview with admissions committee members, who seek to assess whether an applicant possesses the interpersonal and communication skills required to be a successful, practicing physician. Any record of discipline in college is a serious negative for medical school applicants.

Enter John Doe.  He had a tumultuous undergraduate experience at Boston College, which involved at least one significant transgression of Boston College's Code of Student Conduct in May of 2019.  This inappropriate, adjudicated behavior resulted in Doe finishing his undergraduate coursework at two other universities.  Doe proceeded to apply to medical school in the most competitive period, ever, for medical school admissions.  Between 2020 and 2022, Doe applied to medical schools across three cycles.  In the first year, Doe was rejected by 30 medical schools and did not secure admission to a single one.  In the second year, Doe applied to 45 medical schools and was rejected by all.  In the third year, he applied both to Doctor of Medicine (M.D.) and Doctor of Osteopathic Medicine (D.O.) schools.  Doe was rejected by 39 M.D. and 8 D.O. schools, but did secure admission to, and is now attending, Lake Erie College of Osteopathic Medicine ("Lake Erie").

Doe alleges that his failure to secure earlier admission to medical school constitutes either breach of contract or breach of the implied covenant of good faith and fair dealing by Boston College.  The contract at issue is a May 19, 2020 Agreement pursuant to which Boston College agreed that *in response to third party inquiries concerning Doe's disciplinary record,* Boston College would only disclose the single disciplinary finding reflected on Doe's conduct record from

1

2019 and would respond with agreed-upon language.  The undisputed material facts demonstrate that there was no breach of the Agreement by Boston College.  Boston College responded consistently with the Agreement's terms when it received third-party inquiries.  Furthermore, Doe has not shown and cannot show causation.  The undisputed material facts establish that Doe was rejected by medical schools, in particular Temple University Katz School of Medicine ("Temple SOM"), because of several factors which have nothing to do with any alleged breach by Boston College.  Finally, Doe has failed to establish any damages.  His claim for lost earnings because he is attending Lake Erie, instead of Temple SOM, where he was thrice rejected, is entirely speculative and not within the realm of reasonable certainty.[1]

## FACTS

John Doe was a pre-medical student at Boston College from 2016 until 2020, majoring in Biochemistry. SMF ¶ 1.  In 2017, Doe took Employee B's course in Organic Chemistry.  He enjoyed the course, met regularly with Employee B in 2018, and she became a mentor.  In late 2018 and early 2019, Doe's emails and requests for meetings intensified. SMF ¶ 7, 8, 9, 10. In the period January-March 2019 Doe emailed Employee B incessantly.  SMF ¶¶ 7, 8.  On several days during this period, he wrote as many as 5 in a day and on one occasion he wrote 8 emails to Employee B without her responding.  The emails contained numerous references to Doe's personal difficulties and challenges. SMF ¶ 7.  In February 2019, Employee B informed Doe that because of many other demands on her time she could no longer be his mentor.  SMF ¶ 8.  His emailing escalated as Doe became increasingly agitated about the fact that Doe would no longer be his mentor.  SMF ¶¶ 7, 8, 9, 10.

---

[1]  Boston College has separately filed its Motion To Strike the Expert Reports of Plaintiff's Expert Witness Jeroen Walstra and Preclude His Expert Testimony, or in the Alternative for a *Daubert* Hearing on the Admissibility of Mr. Walstra's Reports and Testimony ("Motion to Strike"), and supporting Memorandum.  ECF 48 & 49.

On March 27, 2019 Doe went to the Office of Employee B to give her a suicide note. SMF ¶¶ 9, 10.  She was not present, he left the note and personal effects, walked away, then returned to her office, picked up the note, left again, changed his mind a third time and returned to her office.  On this occasion, she was present.  Doe retrieved his suicide note and later that day went to the University Counseling Service ("UCS").  Id.  On March 29, 2019 the Dean of Students Office issued to Doe an order to stay away from Employee B.  Id. ¶ 11. The Stay Away Order was later updated to specify that Doe could access the Merkert Chemistry Center, which houses Boston College's Chemistry Department, to "attend classes, participate in scheduled in lab research, and attend other academic activities" which were approved by Employee D, one of the Assistant Deans.  Id. ¶¶ 12, 13. On April 30, 2019, Doe contacted Employee B, in violation of the March 29 Stay Away Order.  On May 2, 2019, Boston College held an administrative hearing and found that Doe had failed to comply with the order to stay away from Employee B.  Id. ¶ 14. As a result, on May 7, 2019, the Dean of Students office issued a letter to Doe, informing him that Boston College had found Doe "Responsible" for "Failure to Comply" with the Stay Away Order, and further informing Doe that "you have been placed on University Probation effective immediately," through December 21, 2019.  Id. ¶ 15. On July 9, 2019, Boston College sent Doe a letter alleging nine (9) additional violations of the Stay Away Order.  Id. ¶ 16.

On May 29, 2019, Doe was placed on an involuntary leave for the fall of his senior year. Id. ¶ 2.  Boston College permitted him to complete his senior year off campus, which he did, at Muhlenberg College in the Fall of 2019 (where he earned a C- in Physical Chemistry) and the University of Pennsylvania in the Spring of 2020.  Id. ¶¶ 3, 4, 5.  In 2019, Doe had made allegations of sexual impropriety against Employees A, C, and D, with all of whom he had experienced interpersonal conflicts.  Id. ¶¶ 17, 18.  Doe's complaint to the United States

Department of Education Office of Civil Rights ("OCR") concluded with OCR finding insufficient evidence to support Doe's allegations.  Id. ¶¶ 18, 19.

Doe desired to attend medical or other graduate school. SMF ¶ 26. While the other charges were pending against Doe and while Doe had the right to appeal the OCR findings, Boston College entered into an agreement ("the May 19 Agreement") with Doe, under which he agreed to withdraw all grievances against Boston College employees and not to file any new grievances. Id. ¶¶ 20, 21.  He also affirmed that he had not appealed the OCR findings.  Id. ¶ 21(a).  In return, Boston College agreed to dismiss the pending disciplinary charges against Doe. Id. ¶ 21(b).  Boston College also agreed that, in response to third party inquiries concerning Doe's disciplinary record, it would only disclose the single disciplinary finding reflected on Doe's conduct record from May 2019.  Id. ¶ 22.  With respect to third party inquiries regarding Doe's conduct record, Boston College agreed to comment only: "[Doe] was found responsible for failure to comply with a university directive and completed one semester of university probation."  Id. ¶ 21(e).

Between 2019-2022, Doe had multiple conversations, including at least 15 meetings, some of them over zoom, concerning his applications to medical school with Prof. Danielle Taghian, one of his professors who was an Assistant Director and then Director of the Pre-Health Program.  Id. ¶¶ 27, 28, 29, 30. Doe's "failure to comply" was an Institutional Action which Doe was required to report on the application form prepared by the Association of American Medical Colleges for use by medical school applicants.  Id. ¶ 31.  Doe was also required to provide an explanation of the Institutional Action to the Pre-Health Program, and he knew that any letter he asked the Pre-Health Program to write to accompany his applications would refer to the Institutional Action and his being on university probation. Id. ¶¶ 29, 30, 32.

Prof. Taghian advised Doe that a letter from the Pre-Health Committee was not required; he could apply without one, or he could have a letter of Pre-Health program support without going through the committee process, which involved a vote. SMF ¶ 30.  She explained to him that candidates with university probation had in the past elected not to obtain a letter from the Committee. Id.  She also advised Doe to wait a year or two before applying to medical schools to distance himself from the Institutional Action and gain patient-facing clinical experience. Id. ¶ 38.  Further, she informed him that he would be asked by medical schools to explain the Institutional Action and that when he did so, he should be forthright, show remorse and state what he had learned from the episode. Taghian Aff. ¶ 7. Doe rejected Prof. Taghian's suggestions: he chose to apply in 2020, he chose to ask for a Committee letter of evaluation from the Pre-Health Program, he fabricated a cover story on his application to medical school, and his (false) explanation for the Institutional Action did not make sense to Temple's interviewers. SMF ¶¶ 32, 33, 44, 56, 65, 68, 69, 70, 71, 78. Furthermore, the rejection letters he received from medical schools came as no surprise to him: on July 26, 2020, he emailed Prof. Taghian, saying, "I'm a bit concerned that my stats are too low for any good programs in Chemistry or any medical school." SMF ¶ 38.

### A.     Pre-Health Committee Letters

On May 19, 2020, the Pre-Health Program Committee members met to consider Doe's request that the Program write a Committee letter to accompany his applications. Id. ¶¶ 33, 34, 35; Taghian Aff. ¶ 8. The 14 members voted unanimously to give Doe the weakest possible rating: merely to "present to consider" Doe's credentials for medical school.  SMF ¶ 35. The Committee's July 2, 2020 letter referred to his GPA, year to year, which showed that Doe's GPA declined from his junior year to his senior year –which he completed off campus.  Id. ¶ 6.  It

referred to his reasons for wanting to attend medical school, his having spent time at his mother's

work in an emergency room, and his work in labs at Boston College.  Id. ¶¶ 25, 46.  It referred to

Doe's developing a "dependency" on an instructor. But it is undisputed that Doe developed a

dependency on Employee B.  Id. ¶¶ 7, 8, 9, 10. Doe submitted a lengthy explanation of the

Institutional Action to the Pre-Health Committee, which included Doe's explanation verbatim in

the July 2, 2020, Pre-Health Committee letter.  Id. ¶ 25, 33, 46.  Significantly, the July 2, 2020,

Committee letter did not refer to the many emails that Doe had written to Employee B, did not

refer to Doe's giving a suicide letter to Employee B, and said nothing about the dismissed and

unadjudicated charges, which involved alleged stalking and numerous incidents of anonymous

emails. Id. ¶¶ 9, 16, 23. Three Boston College professors wrote letters of evaluation that

accompanied Doe's applications.  SMF ¶¶ 25(e), 40. Two were from professors who ran labs

where Doe had worked.  SMF ¶ 40.  The third letter was from a Biology professor, who indicated

that she could not see Doe performing any role in Pediatrics (pediatrics is a required rotation in

medical schools). SMF ¶ 40.  Doe's applications contained his own description of his

Institutional Action:

> A notice was given that a part of the chemistry department was inaccessible. The
> notice did not specify a time frame. It was the end of the semester and I had
> information that I needed with regards to my work in the department.
> Unfortunately, I accessed a part of the department that was restricted, gathered my
> data and left. I was identified and found responsible for failure to comply and was
> placed on one semester probation.

SMF ¶ 43.  Doe concedes that this explanation was a "cover story." SMF ¶¶ 44, 65, 78. Boston

College did not see Doe's "cover story." Taghian Aff. ¶ 10.

Doe believed that his best chance of getting into medical school was at Temple SOM,

because he had "connections" there:  his mother was an alumna, had been on the Temple SOM

admissions committee, and had worked as an Emergency Medicine physician at St. Luke's

Hospital, which is affiliated with Temple SOM.  SMF ¶ 49. According to Doe, Temple SOM is

"the only medical school of relevance in this action." SMF ¶ 48.

### B.    Temple SOM's Consideration of Doe's Application in Year 1

Applicants to Temple SOM are screened, and selected candidates are slated for

interviews. Professor Levin of Temple SOM was the primary Faculty interviewer of Doe in Year

1, and was responsible for assessing his academic potential, professionalism and ethics, and other

qualities. SMF ¶ 53. Levin prepared an overall summary of the results of his review of Doe's file

and the interview.  SMF ¶¶ 53-56. Prof. Levin highlighted the following issues with Doe's

application:

- Doe's GPA was lower than other applicants that they typically accepted.
- Doe received a C minus in Physical Chemistry at Muhlenberg College; Levin observed that Doe almost failed the class, compared to most applicants who do not have any grades lower than a B minus.
- Doe did not adequately explain or take responsibility for the Institutional Action.
- Doe's recommendation letters "indicated some negative qualities."

SMF ¶¶ 53-56.  Dr. Levin concluded that it was not appropriate to admit Doe into medical

school, "taking into account [his] interview with him, with the poor interpersonal skills, poor

communication skills, lack of emotional empathy, in addition to the materials that [he] reviewed

in his application, including the institutional action which [he] felt like he didn't adequately

explain or take responsibility for, as well as some of his recommendation letters that indicated

some negative qualities." SMF ¶ 56.  Accordingly, Temple SOM, which received more than

14,000 applications that year for a class of 240 students, rejected Doe's application for the class

entering in the Fall of 2021.  SMF ¶ 57.

### C.    Temple SOM's Consideration of Doe's Application in Year 2

In 2021, Doe applied to 45 medical schools, 24 of which he had not applied to in

2020.  He was rejected by all 45.  SMF ¶¶ 59, 75.  Doe's applications again contained his

7

description ("cover story") of his Institutional Action as stemming from his having accessed a part of the Chemistry Department which was restricted.  SMF ¶ 44.  Prof. Taghian, recognizing the distance in time from the 2019 violation, and Doe's potential growth since the incident, modified the Pre-Health Committee letter by deleting the paragraph referring to Doe's "repeatedly" violating a university directive and Doe's explanation of the Institutional Action.  Id. ¶¶ 62, 63.  In addition, Prof. Taghian wrote a separate letter of recommendation for Doe, based on her having been one of his Biology professors, which supported Doe's applications to medical school.  Id. ¶ 63.  All schools to which Doe applied in 2021 for entry in 2022 received Prof. Taghian's letter of recommendation, as well as the modified committee letter and letters of evaluation from three other professors.  Id. ¶¶ 60-64.

Professor Abrams was the primary Temple SOM Faculty interviewer in Year 2.  SMF ¶¶ 67-74.  After interviewing him, Dr. Abrams was "very concerned by his communication skills" and did not believe he belonged in medical school, as good communication skills were "critically important" to being a physician.  SMF ¶ 68.  Prof. Abrams rated Doe as 2 on a scale of 1-5 in the "Interpersonal and Communication Skills" section of her Faculty Interview Evaluation, writing, "below average –[Doe] struggled with communication during our interview. He made virtually no eye contact during the session." Id. ¶¶ 68-69.

Prof. Abrams was also uncomfortable that Doe could not explain the Institutional Action "in a way that made sense to [her]"; she felt "that [she] wasn't understanding the whole picture." SMF ¶ 68. After her interview, she contacted Boston College to obtain more information. Id. ¶ 70.  In *compliance with the May 19 Agreement*, Boston College responded by reiterating that Doe had been found responsible for failure to comply with a university directive, and that it

could not say anything further. SMF ¶ 71. Temple SOM, which received more than 10,000

applications for the 2021-2022 cycle, again rejected Doe's application for admission. SMF ¶ 73.

### D.    Doe's Applications and Acceptance by Lake Erie College of Osteopathic Medicine, and his Rejection by Temple SOM in Year 3

In 2022, Doe decided to expand his search to include schools of osteopathic

medicine.  SMF ¶ 76. Doe also applied again to allopathic schools, including Temple SOM,

which declined to interview him and rejected him on April 6, 2023. SMF ¶¶ 82, 83. Doe was

admitted to Lake Erie. SMF ¶ 84. After three full semesters at Lake Erie, Doe had a GPA of 3.78

and was third in his group of 27 students. Id. ¶ 84. He expects to graduate in 2027. Id. ¶ 86.

Since 2020, graduates of schools of osteopathic medicine, with "D.O. degrees," are

treated equally to graduates of schools of allopathic medicine, with "M.D. degrees," for purposes

of applying to "match" to residencies in their desired specialties, such as Emergency Medicine,

Internal Medicine, Family Medicine, and other specialties.  SMF ¶ 91. In 2027, when Doe

graduates from Lake Erie, he hopes to "match" into a residency in Internal Medicine, a 3-year

program, following which he hopes to attain a fellowship in Hematology/Oncology, which would

be for an additional 3 years. Id. ¶¶ 88, 89. After that time -- in 2033 -- he hopes to practice as a

Hematologist/Oncologist. When asked where he expects to apply to work in 2027, when he

graduates, he testified that it's "far too soon" to know that kind of information. Id. ¶ 90.

 Doe's expert witness, Jeroen Walstra, has opined that under three different scenarios,

Doe has been damaged monetarily in a range between approximately $522,781 and $4,858,768

because Doe's lifetime earnings are likely diminished due to a two-year delay in medical school

acceptance and his enrollment in a DO program rather than an MD program, which generally

offers higher earning potential.[2]  Doty Aff., Ex. 1, p. 7; Ex. 3, p. 2.

## ARGUMENT

Summary judgment is appropriate where the movant demonstrates that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." <u>Salomon v. Massachusetts Hous. Fin. Agency</u>, No. 22-cv-10181-ADB, 2025 WL 1594483, at *3-4 (D. Mass. June 5, 2025) (quoting Fed. R. Civ. P. 56(a)).

To prevail, the moving party "must 'affirmatively produce evidence that negates an essential element of the non-moving party's claim,' or, using 'evidentiary materials already on file ... demonstrate that the non-moving party will be unable to carry its burden of persuasion at trial.'" <u>Id.</u> (quoting <u>Ocasio-Hernández v. Fortuño-Burset</u>, 777 F.3d 1, 4 (1st Cir. 2015)). Once a party "has properly supported its motion for summary judgment, the burden shifts to the non-moving party, who 'may not rest on mere allegations or denials of his pleading, but must set forth specific facts showing there is a genuine issue for trial.'" <u>Barbour v. Dynamics Research Corp.</u>, 63 F.3d 32, 37 (1st Cir.1995) (quoting <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 256 (1986)). The Court "must take the evidence in light most flattering to the party opposing summary judgment" but this "does not give [the nonmoving party] a free pass at trial.  <u>Salomon</u>, <u>supra</u> at *4 (quoting <u>Cochran</u>, <u>supra</u>; <u>Hannon v. Beard</u>, 645 F.3d 45, 48 (1st Cir. 2011)). Moreover, the Court is to ignore "conclusory allegations, improbable inferences, and unsupported speculation." <u>Id.</u>  (quoting <u>Cochran</u>, <u>supra</u> at 6).

## I.     BOSTON COLLEGE DID NOT BREACH THE MAY 19 AGREEMENT OR VIOLATE THE COVENANT OF GOOD FAITH AND FAIR DEALING

### A.     The Undisputed Material Facts Show that Boston College Did Not Breach the May 19 Agreement

---

[2] <u>See</u> Boston College's Motion to Strike.  ECF 48 & 49.

On a breach of contract claim, "a plaintiff must demonstrate that there was an agreement between the parties; the agreement was supported by consideration; the plaintiff was ready, willing, and able to perform his or her part of the contract; the defendant committed a breach of the contract; and the plaintiff suffered harm as a result." Eaton v. Town of Townsend, No. 22-1334, 2023 WL 3317986, *6 (1st Cir. May 9, 2023) (quoting Bulwer v. Mount Auburn Hosp., 473 Mass. 672, 690 (Mass. 2016)).

Under the May 19 Agreement, Boston College agreed as follows:

> With respect to [Doe]'s conduct record or disciplinary history, consistent with federal and state law, Boston College and its employees may only disclose in response to third-party inquiries concerning [Doe]'s disciplinary record the single disciplinary finding reflected on [Doe's] conduct record from May 2019. With respect to that incident Boston College and its employees will comment only: "Mr. [Doe] was found responsible for failure to comply with a university directive, and  completed one semester of university probation."

SMF ¶ 21, 22. Boston College's obligation to provide the response above applied only "in response to third-party inquiries." Id. Boston College received only three such inquiries from Temple, and in all circumstances, Boston College responded consistently with the Agreement's language.  SMF ¶¶ 50-51, 69-72. For example, on July 31, 2020 Temple SOM emailed Corey Kelly requesting "an official statement" with "details of the event and the outcome of the institutional process." SMF ¶ 50.  Boston College responded by letter dated August 3, 2020 that Doe had been found responsible for "failure to comply" and served one semester of probation. Boston College's response was consistent with the May 19, 2020 agreement.  SMF ¶ 51.

The May 19 Agreement did not refer to a Pre-Health Committee letter – an *optional* letter that Doe requested Boston College to submit on his behalf.  SMF ¶¶ 20-22.  Indeed, Prof. Taghian advised Doe that he did not need a letter from the Pre-Health Program to apply to medical schools, and, that in view of the disciplinary finding, which was a reportable event, Doe

should wait a year before applying to medical schools. SMF ¶¶ 32, 37-38. Doe rejected Prof. Taghian's advice, choosing to apply in 2020 and asking for a Committee letter of evaluation from the Pre-Health Program. SMF ¶ 32; Taghian Aff. ¶ 5. Moreover, the May 19 Agreement did not refer to letters of evaluation that Doe requested Boston College Professors to write for use in his medical school applications. Doe had no reasonable expectation that evaluators would not provide medical schools with their honest assessment of the positives and negatives in Doe's record at Boston College. The Agreement also imposed *no* restrictions on Doe's responses to questions that medical school interviewers might ask *him* concerning the Institutional Action or any other aspect of his college years.

On the record evidence, Boston College did not breach the May 19 Agreement, and summary judgment should enter for Boston College on this basis. River Farm Realty Trust v. Farm Casualty Ins. Co, 943 F.3d 27, 41-42 (1st Cir. 2019) (affirming summary judgment where insurer complied with procedures outlined in policy); edv & cad group v. Scopic Software LLC, 771 F. Supp. 3d 33, 49 (D. Mass. 2025) (granting summary judgment as defendant's conduct complied with unambiguous provisions of agreement).

### B. The Undisputed Material Facts Show that Boston College Did Not Breach the Implied Covenant of Good Faith and Fair Dealing

In addition, "[u]nder Massachusetts law, every contract implies good faith and fair dealing between the parties to it." edv & cad group, 771 F. Supp. 3d at 49 (quoting Young v. Wells Fargo Bank, N.A., 717 F.3d 224, 237 (1st Cir. 2013)). "The covenant of good faith and fair dealing requires that 'neither party shall do anything that will have the effect of destroying or injuring the right of the other party to the fruits of the contract.'" Id. at 49 (quoting Young, 717 F.3d at 237-38). "However, the implied covenant may not be invoked to create rights and duties not contemplated by the provisions of the contract or the contractual relationship." Dworman,

12

775 F. Supp. 3d at 561 (citation omitted).

"A breach [of the covenant of good faith and fair dealing] occurs when one party violates the reasonable expectations of the other." edv & cad group, 771 F. Supp. 3d at 49 (quoting Weiler v. PortfolioScope, Inc., 469 Mass. 75, 83 (2014) (quotations and citations omitted)). "There is no requirement that bad faith be shown; instead, the plaintiff has the burden of proving a lack of good faith." Id. (quoting Robert & Ardis James Found. v. Meyers, 474 Mass. 181, 190 (2016)). The plaintiff must present "evidence to demonstrate a lack of good faith, such as 'a dishonest purpose, conscious doing of wrong, or breach of duty through motive of self-interest or ill will.'" Id. (quoting Clinical Tech., Inc. v. Covidien Sales, LLC, 192 F. Supp. 3d 223, 237 (D. Mass. 2016)).

There is no record evidence of any dishonest purpose or conscious wrongdoing by Boston College. To the contrary, the record reveals that Boston College responded to third-party inquiries consistently with the Agreement. The Agreement's restrictions simply did not apply to the *optional* Pre-Health Committee letter that was specifically requested *by Doe*. Any interpretation otherwise would "create rights and duties not contemplated by the provisions of the contract or the contractual relationship." Dworman, 775 F. Supp. 3d at 561 (entering summary judgment on breach of contract and breach of implied covenant claims where no reasonable juror could conclude that defendants breached the contract or acted with "dishonest purpose or conscious wrongdoing"); see Guldseth v. Fam. Med. Assocs. LLC, 45 F. 4th 526, 537–38 (1st Cir. 2022) (affirming summary judgment on implied covenant claims holding "[t]he covenant does not supply terms that the parties were free to negotiate but failed to include . . . Nor does it create rights and duties not otherwise provided for in the contract.").

The undisputed material facts establish that Doe was advised of the risks of the Pre-

Health Committee letter and rejected that advice.  Further, the fact that Boston College informed

him that he could apply to medical schools without a committee letter or apply with a letter of

support and forgo the Committee voting process undermines any argument of a lack of good

faith.  See edv & cad group, 771 F. Supp. 3d at 46-52 (no breach of contract where "record [wa]s

devoid of any evidence showing that [defendant] terminated the agreement in bad faith").

## II.    DOE HAS NOT ESTABLISHED CAUSATION

In order to establish a breach of contract, the plaintiff must prove that he "suffered harm

*as a result*" of defendant's breach.  Eaton, 2023 WL 3317986, at *6 (emphasis added) (quoting

Bulwer, 473 Mass. at 690); see also Brooks v. AIG SunAmerica Life Assur. Co., 480 F.3d 579,

586 (1st Cir. 2007).  Doe has alleged that "[a]s a proximate and foreseeable result of BC's

conduct, Doe has been injured and suffered damages."  Compl. ¶ 130. However, the undisputed

material facts do not establish *any* connection between Boston College's alleged breach and

Doe's purported damages.

Doe claims that Temple – the only medical school at issue – rejected his applications in

Years 1 and 2 as a result of the disclosure of information by Boston College in breach of the May

19 Agreement.  As argued above, there was no breach.  However, even assuming Doe could

establish a breach, Temple rejected Doe's applications because of *many* factors besides any

alleged improper disclosure by Boston College.  SMF ¶¶ 53-56 (Levin) and 67-71 (Abrams).

Significantly, Doe's applications to Temple for both years included his "cover story" for the

Institutional Action:  that he received a "notice" that "a part of the chemistry department was

inaccessible"; that he "accessed a part of the department that was restricted, gathered [his] data

and left"; and was "identified and found responsible for failure to comply and was placed on one

semester probation."  SMF ¶¶ 44, 65, 78.  His "cover story" did not work. Neither Prof. Levin

nor Prof. Abrams accepted Doe's description as a reasonable explanation.

With respect to Doe's application to Temple SOM in Year 1, Prof. Levin assessed that Doe "struggled academically in his undergraduate coursework with a relatively low GPA." SMF ¶ 55.  Dr. Levin emphasized that Doe received a C minus in Physical Chemistry at Muhlenberg College and almost failed the class; did not adequately explain or take responsibility for the Institutional Action; and that Doe's recommendation letters "indicated some negative qualities." SMF ¶ 56. Dr. Levin ultimately concluded that it was not appropriate to admit Doe into medical school "taking into account [his] interview with him, with the poor interpersonal skills, poor communication skills, [and] lack of emotional empathy . . ." SMF ¶ 56.

After Dr. Abrams' interview of Doe in Year 2, she was "very concerned by his communication skills, which is very important to the Temple admissions committee." She did not believe Mr. Doe belonged in medical school because good communication skills were "critically important" to being a physician.  SMF ¶ 68. Ultimately, Dr. Abrams rated Doe as 2 on a scale of 1-5 in the "Interpersonal and Communication Skills" section of her Faculty Interview Evaluation, writing, "below average –[Doe] struggled with communication during our interview. He made virtually no eye contact during the session." Id. ¶ 69.

Further, Doe could not explain the Institutional Action "in a way that made sense to [Dr. Abrams]" who "felt that [she] wasn't understanding the whole picture."  SMF ¶¶ 68-70.  Dr. Abrams reached out to Boston College's Office of Student Conduct following the interview to obtain more information about Doe's Institutional Action.  Id. ¶ 70.  Boston College responded by reiterating that Doe had been found responsible for failure to comply with a university directive, and that it could not say anything further, in compliance with the May 19 Agreement. SMF ¶ 71.

Doe ignores the effect that his interviews had on his ability to gain acceptance. Professor Taghian and Doe communicated several times on this specific issue. On April 29, 2022 Doe informed Prof. Taghian that he was rejected after his Georgetown interview.  Prof Taghian responded:

> The data that I have as a pre-health advisor indicates that you were interviewed at 4 medical schools; Temple, Geisinger, Georgetown and Hackensack. As medical school interviews are granted to only a few hundred students out of several thousands who apply to each school, it would appear that your committee letter and the other materials supporting your application have accomplished the intended goal. Being rejected from a school post-interview suggests that you need to reflect on how you handled yourself in the interviews and identify how to improve the impression you make in that setting.

SMF ¶ 66.

The undisputed facts do not contain *any* evidence from *any* medical school that the reason the medical school rejected Doe's applications was because of language in the first Pre-Health Committee letter or because of any communication by Boston College. Furthermore, Boston College revised the Pre-Health Committee letter in Year 2; accordingly, the 15 new schools to which Doe applied in Year 2 would never have seen the Pre-Health Committee Letter in Year 1. Yet all of those schools rejected Doe's applications as well.  On the undisputed evidence, it is speculation to claim that Doe was rejected by 30 medical schools in Year 1 and 45 medical schools in Year 2 because of isolated comments in the Pre-Health Committee letter in Year 1. Simply put, Doe cannot and has not established that any comment in Boston College's Pre-Health Committee letter caused him to be rejected from medical school. See Almeida-Leon v. WM Cap. Mgmt., Inc., 993 F.3d 1, 13 (1st Cir. 2021) (affirming summary judgment; no plausible theory of liability)(citing RSA Media, Inc. v. AK Media Grp., Inc., 260 F.3d 10, 16 (1st Cir. 2001) (no plausible theory of causation)); Doering Equip. Co. v. John Deere Co., 61 Mass. App. Ct. 850, 855 (2004) (no causal connection between the alleged breach and alleged

damages). For this independent reason, summary judgment should enter for Boston College.

III.    **DOE'S CLAIM OF DAMAGES BY NOT BECOMING A HEMATOLOGIST/ONCOLOGIST IS WHOLLY SPECULATIVE.**

Even if the Court concludes that there is a genuine issue of material fact as to whether Boston College breached the May 19 Agreement, or as to whether Doe was rejected by 30, and then 46, medical schools because of a supposed breach of contract or violation of the implied covenant, summary judgment is warranted because Doe has failed to establish any damages arising from any such breach or violation.  Doe's only evidence of damages derives from a report by his expert witness, Jeroen Walstra, who hypothesizes that John Doe's lifetime earnings are diminished due to a two-year delay in commencement of medical school and his enrollment in a DO program rather than an MD program. Doty Aff., Ex. 1, p. 7.  He opines as to Doe's potential "lost earnings" in 3 hypothetical future scenarios: two where Doe does not become a Hematologist/Oncologist, his preferred medical practice, but a family practitioner, with vastly lower earnings than he would earn as a graduate of Temple SOM, and one where Does becomes an oncologist but reaches his career milestone 2 years later than planned.  Id. p. 8.  As set forth in Boston College's Motion to Strike, incorporated herein by reference, Walstra lacks the requisite qualifications to opine about Doe's potential earnings as a medical professional, and his opinions are based wholly on speculation.  Accordingly, the report must be struck due to its inherent unreliability.  Doe's remaining categories of alleged damages are likewise unsupported or not cognizable as a matter of law.

In deciding a motion for summary judgment, the court may consider only evidence that would be admissible at trial or presented in admissible form.  See Fed. R. Civ. P. 56(c)(2); Gorski v. N.H. Dep't of Corr., 290 F.3d 466, 475–76 (1st Cir. 2002); Vazquez v. Lopez–Rosario, 134 F.3d 28, 33 (1st Cir. 1998).  While damages need not be proven with precision, a plaintiff is

required to establish its losses to a reasonable degree of certainty. Pierce v. Clark, 66 Mass. App. Ct. 912, 914 (2006). The "rule of damages in an action for breach of contract is that the plaintiff 'is entitled in general to damages sufficient in amount to compensate him for the loss actually sustained by him .... He may not insist upon extraordinary or unforeseen elements of damages, but only such as flow according to common understanding as the natural and probable consequences of the breach....' " Pierce supra, at 914 (quoting Boylston Hous. Corp. v. O'Toole, 321 Mass. 538, 562 (1947)). "While it is true that a plaintiff need not prove damages with mathematical certainty, 'damages cannot be recovered when they are remote, speculative, hypothetical, and not within the realm of reasonable certainty.'" Kitner v. CTW Transport, Inc., 53 Mass. App. Ct. 741, 748 (2002) (quoting Lowrie v. Castle, 225 Mass. 37, 51 (1916)).

Doe is currently beginning his third year at Lake Erie, and expects to graduate in 2027. SMF ¶¶ 86, 90. He intends to apply for residencies upon graduation, but does not yet know where he will apply. Id. ¶ 90. ("I have ideas but that's so far in advance [referring to 2027], nobody in my position would be able to know that.") Students in their 4th year at schools of osteopathic medicine are treated the same as students in their 4th year of schools of allopathic medicine (M.D.), students at both D.O. and M.D. schools, can apply to "match" with specialties in fields they wish to pursue. SMF ¶ 91. Students from Lake Erie and Temple SOM have the same ability to apply to residencies in multiple fields. SMF ¶ 92, 93. Despite this, Walstra assumes that Doe's career prospects are somehow limited as a result of his DO degree, and that Doe definitely would have become an oncologist if he attended a M.D. school. Doty Aff. Ex. 1, pp. 6-7, 8.

To become a Hematologist/Oncologist, Doe would first need to secure a residency in Internal Medicine, which would be a three-year program, and complete it successfully. Taghian

Aff. ¶ 19.  He would then have to obtain a fellowship in Hematology/Oncology – an additional

three year program – and complete it successfully.  Id., Taghian Aff. Ex. A.  He would then need

to secure employment as a Hematologist/Oncologist. By that time, it will be 2033, at least 13

years after the time Boston College first wrote letters of evaluation for Doe.  It is impossible to

determine at this stage whether in 8 years time Doe will be in his chosen medical field, or a

different field, given the many hoops that he must jump through to obtain gainful employment.

It is also impossible to determine his future income given the unknowns as to his future employer

(e.g., private, public, hospital, university) and type of work (e.g., clinical, research, or academic).

In short, any alleged damages arising from Doe's future employment as a physician in an

unknown practice or specialty are "not within the realm of reasonable certainty."  See Albert v.

Warner-Lambert Co., 234 F. Supp. 2d 101, 103 (D. Mass. 2002) (quoting Lowrie, 225 Mass. at

51–52) (granting summary judgment on all claims where expert testimony on lost profits, the

only evidence of damages, was insufficiently reliable to be admissible); Quinones-Pacheco v.

Am. Airlines, Inc., 979 F.2d 1, 6-7 (1st Cir. 1992) (upholding exclusion of economist testimony

concerning lost earnings where opinion was not supported by the record).[3]

The same is true with respect to Doe's claim that his receipt of income has been

"delayed" by two years. [4]  As explained above, Doe has failed to establish any purported "delay"

was the result of any alleged breach by Boston College.  Regardless, Walstra has failed to

account for the fact that the average student entering medical school is twenty-five years old and

has taken two "gap years" prior starting their medical studies.  Moreover, there is no evidence in

---

[3] See also Abdulky v. Lubin & Meyer, P.C., 102 Mass. App. Ct. 441, 453-54 (2023) (reversing denial of
motion for summary judgment, finding that the plaintiff's expert evidence on damages was insufficient
and thus summary judgment should have entered for the defendants); Grassi Design Group, Inc. v. Bank
of America, N.A., 74 Mass. App. Ct. 456, 461-62 (2009) (summary judgment appropriate where
plaintiff's expert report was insufficiently reliable to support damages).
[4] Ex. 20, Answer No. 18.

the record that accounts for Doe's education and experience during those two years, which he spent working at the Broad Institute, pursuing a Master's Degree at Georgetown, and working in a lab at Johns Hopkins. These experiences and his additional degree may have a positive impact on his admission into school, future prospects, and income.  Orchard Trailers, Inc. v. Sundowner Trailers, Inc., No. CV 07-11451-RWZ, 2009 WL 10693614, at *4 (D. Mass. Mar. 13, 2009) (entering summary judgment on breach of contract claim where there was no evidence of damages or that damages were attributable to breach) (citing Celotex Corp., 477 U.S. at 322-23).

With respect to Doe's claim for "generalized emotional distress,"[5] "such claims are generally not cognizable in a breach of contract claim." See Young v. Wells Fargo Bank, N.A., 109 F. Supp. 3d 387, 395 (D. Mass. 2015), aff'd, 828 F.3d 26 (1st Cir. 2016) (citing John Hancock Mut. Life Ins. Co. v. Banerji, 447 Mass. 875, 888 (2006) ("As to the contract claim for emotional distress, damages for mental suffering are generally not recoverable in an action for breach of contract.")).  Plaintiff has not offered any argument that an exception to this rule applies.  John Hancock Mut. Life Ins. Co., 446 Mass. at 888.   As Plaintiff has failed to make a showing sufficient to establish damages, summary judgment is warranted.

## CONCLUSION

For the above reasons, Boston College submits that a) it did not breach the May 19 Agreement or violate the implied covenant, b) there is no causal connection between any breach of the May 19 Agreement and Doe's rejections by medical schools, and c) Doe's claim of damages based on his claimed inability to become a Hematologist/Oncologist is entirely speculative and not within the realm of reasonable certainty.  For these reasons, Boston College respectfully submits that the Court should enter summary judgment in its favor.

---

[5]  Ex. 20, Supp. Answer No. 20.

Respectfully submitted,

TRUSTEES OF BOSTON COLLEGE

By its attorneys,

/s/ Alan D. Rose
Alan D. Rose (BBO # 427280)
Meredith Wilson Doty (BBO # 652220)
Daniel M. Lee (BBO # 703616)
ROSE LAW PARTNERS LLP
One Beacon Street, 23rd Floor
Boston, Massachusetts 02108
Tel: (617) 536-0040
Fax: (617) 536-4400
adr@rose-law.net
mwd@rose-law.net
dml@rose-law.net

Date: September 9, 2025

## CERTIFICATE OF SERVICE

I hereby certify that I caused this document to be filed through the ECF system and that it will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper and/or electronic copies will be sent to those indicated as non-registered participants.

/s/ Alan D. Rose
Alan D. Rose