UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| JOHN DOE, Plaintiff, v. TRUSTEES OF BOSTON COLLEGE, Defendant. | * | Civil Action No. 23-cv-12737-ADB |

**MEMORANDUM AND ORDER**

BURROUGHS, D.J.

Plaintiff John Doe ("Doe") brings this action against Defendant Trustees of Boston College ("Boston College") for breach of contract and breach of the implied covenant of good faith and fair dealing. As alleged in his amended complaint, Doe entered a settlement agreement with Boston College (the "May 19 Agreement") resolving accusations that he violated Boston College's Code of Student Conduct and grievances that he filed against several Boston College employees. [ECF No. 17 ("Amended Complaint" or "Am. Compl.")]. As part of the May 19 Agreement, Boston College agreed that, in response to any third-party inquiries, it would disclose only a single disciplinary finding on Doe's conduct record, using agreed upon language. [Id. ¶¶ 78–83]. Doe alleges that Boston College breached this contract and the implied covenant of good faith and fair dealing by disclosing additional information to Temple School of Medicine ("Temple SOM"), leading to the denial of his application for admission. [Id. ¶¶ 124–138].

Presently before the Court are Boston College's motions for summary judgement, [ECF No. 51], to strike the testimony of Doe's expert, Jeroen Walstra ("Walstra"), [ECF No. 48], and to strike portions of Doe's statement of facts, [ECF No. 78]; and Doe's motion to strike portions of the affidavit of Professor Danielle Taghian ("Professor Taghian"), [ECF No. 60]. For the reasons set forth below, Boston College's motion to strike portions of Doe's statement of facts, [ECF No. 78], and Doe's motion to strike portions of Professor Taghian's affidavit, [ECF No. 60], are **DENIED**. Boston College's motion to strike Walstra's expert testimony, [ECF No. 48], is **GRANTED IN PART** and **DENIED IN PART**. Boston College's motion for summary judgment, [ECF No. 51], is **GRANTED IN PART** and **DENIED IN PART**.

## I. BACKGROUND

### A. Material Facts

The Court draws the facts, unless otherwise stated, from the parties' combined Rule 56.1 statements of material facts, which are Boston College's response to Doe's statement of undisputed material facts, [ECF No. 74], and Doe's response to Boston College's statement of undisputed material facts, [ECF No. 65], as well as documents referenced therein and, where necessary, other documents of record.

#### 1. Doe's Institutional Action and Grievances

In 2016, Doe matriculated at Boston College, where he was a biochemistry major. [ECF No. 65 ¶ 1]. From approximately November 2018 to March 2019, Doe sent one of his former professors, referred to here as "Employee B," numerous, often lengthy emails regarding their mentor/mentee relationship, Doe's history of and ongoing struggles with mental health, boundaries set by Employee B for her interactions with Doe, gifts and other items that Doe wanted to give Employee B, his paranoia and jealousy about seeing Employee B with other

students, and various other topics. [Id. ¶ 7]; [ECF No. 54-25]. On February 1, 2019, Employee B emailed Doe that because she was teaching an additional section of general chemistry, "in order to maintain [her] well-being," she would not be able to meet with him anymore that semester or be able to respond to his emails unless they related to letters of recommendation or other time-sensitive matters. [ECF No. 65 ¶ 8]. That same day, Doe responded by sending Employee B four emails in which he asked her if he could "say goodbye for now/apologize in person," specified that he was "trying to be [Employee B's] friend," asked if he could still send Employee B emails even if she could not respond, and made many other statements, including that without Employee B he did not "really have anyone to talk to." [ECF No. 54-29].

On March 27, 2019, Doe went to Employee B's office to give her a suicide note. [ECF No. 65 ¶ 9]. Doe then went to the University's counseling services and was transported to Faulker Hospital. [Id.]. The following day, Doe emailed Employee B informing her that he had tried to drop off the suicide note to her, but that he "immediately regretted doing so and as such retrieved it from [her]," and then went to crisis counseling. [Id. ¶ 10]. In the email, Doe also stated that he contacted Employee B because he thought he would "feel more comfortable if someone without a mental health background knew where [he] was" and that Employee B was "kind of the only person who [Doe knew] up here that matches that description." [Id.].

On March 29, 2019, the Dean of Students Office at Boston College issued Doe an order to stay away from Employee B. [ECF No. 65 ¶ 11]. On April 30, 2019, there was an unspecified incident involving Doe and the stay away order. [ECF No. 65 ¶ 14]; [ECF No. 54-12 at 1]. Also on April 30, 2019, Boston College amended Doe's stay away order to state: "You are not permitted to be in Merkert Center except to attend classes, participate in scheduled in lab research, and attend other academic activities that are approved in advance by Dean of Students

[Employee D]."[1] [ECF No. 65 ¶ 12]; [ECF No. 54-10]. Boston College held an administrative hearing on May 2, 2019, regarding the April 30 incident. [ECF No. 65 ¶ 14]; [ECF No. 54-12 at 2–3].

On May 5, 2019, the Dean of Students Office issued Doe another updated stay away order mandating that Doe could only be at the Merkert Chemistry Center to take his final exams and for other academic meetings expressly approved in advance by Employee D or a specific associate dean. [ECF No. 65 ¶ 13]; [ECF No. 54-11].

On May 7, 2019, the Dean of Students Office issued a letter to Doe informing him that Boston College had found him "responsible" for "failure to comply" with the stay away order based on the April 30 incident and that he had "been placed on University Probation effective immediately." [ECF No. 65 ¶ 15]. The letter stated that the probation was in effect through December 21, 2019. [Id.].

On May 29, 2019, Boston College placed Doe on an involuntary medical leave of absence for his senior year. [ECF No. 65 ¶¶ 2, 4]. Doe was permitted to take courses at other schools and the credits would count towards Doe's graduation requirements. [Id. ¶¶ 3–5]. On July 9, 2019, Boston College sent Doe a letter alleging that he had committed nine additional violations of the stay away order, including by approaching Employee B at the Merkert Chemistry Center, sending her multiple emails using aliases, and walking past her private home. [Id. ¶ 16]. Doe denies that he engaged in the conduct alleged in the July 9 letter. [ECF No. 74 ¶ 98].

[1] The record is not clear as to whether Boston College amended the stay away order before or after the alleged April 30 incident.

On December 20, 2019, Boston College sent Doe a letter alleging that he committed 24 additional violations of the stay away order during the summer of 2019, including that he attempted to contact Employee B through seven different fake email addresses and to steal Employee B's identity by opening a "Searchbug" account with her name and home address. [ECF No. 65 ¶ 23]; [ECF No. 54-13]. Doe also denies that he committed these violations. [ECF No. 65 ¶ 23].

Additionally, in 2019 Doe made allegations of sexual impropriety against Employee A, a Boston College professor, and Employee D, an Assistant Dean at Boston College, [ECF No. 65 ¶ 17], and filed a Title IX claim with the Department of Education, Office of Civil Rights ("OCR") against Boston College alleging discrimination and retaliation, [id. ¶ 18]. On February 10, 2020, OCR found that there was "insufficient evidence" to support Doe's allegations that Boston College discriminated against him on the basis of a disability or retaliated against him for filing complaints. [Id. ¶ 19]; [ECF No. 54-24].

In the fall of 2019, Doe attended Muhlenberg College, where he received a C- in his Physical Chemistry course. [ECF No. 65 ¶ 5]. In the spring of 2020, Doe attended the University of Pennsylvania. [Id.]. Throughout his four years of undergraduate school, Doe's grade point average was 3.386 for the 2016–2017 school year, 3.844 for the 2017–2018 school year, 3.467 for the 2018–2019 school year, and 3.330 for the 2019–2020 school year, with a cumulative grade point average of 3.519 and a cumulative science grade point average of 3.46. [Id. ¶ 6].

2. The May 19 Agreement

On May 19, 2020, Boston College and Doe entered into the May 19 Agreement. [ECF No. 65 ¶ 20]; [ECF No. 54-15]. Pursuant to the May 19 Agreement, Doe agreed that he would

withdraw all grievances he had made against Boston College and current or former employees of Boston College, not repeat the allegations of sexual misconduct against Boston College employees, and not appeal the 2020 OCR findings of "insufficient evidence." [ECF No. 65 ¶ 21]; [ECF No. 54-15]. Boston College agreed that it would dismiss the pending disciplinary case against Doe and expunge his Notice to Appear and other documents related to the charges from the student conduct database. [ECF No. 65 ¶ 21]; [ECF No. 54-15]. The May 19 Agreement further states:

> Boston College and its employees may only disclose in response to third-party inquiries concerning [Doe's] disciplinary record the single disciplinary finding reflected on [Doe's] conduct record from May 2019. With respect to that incident Boston College and its employees will comment only: "[Doe] was found responsible for failure to comply with a university directive, and completed one semester of university probation."

[ECF No. 65 ¶ 21]; [ECF No. 54-15].

3. Doe's Pre-Health Advising

From 2018 to 2022, Doe received advising from Boston College and members of the University's Pre-Health Committee (the "Pre-Health Committee") regarding his applications to medical school. [ECF No. 65 ¶ 27]. On February 7, 2020, Professor Taghian, who was an Assistant Director and later the Director of the Pre-Health Committee, spoke over the phone with Doe regarding the medical school application process and the Pre-Health Committee's role in the process. [Id. ¶ 28–29]. Following the phone call, Professor Taghian sent Doe an email reiterating that if Doe elected to have a Pre-Health Committee letter, his institutional action would be disclosed, [id.], and stating that as a reportable event, it would be "briefly discussed in [Doe's] committee letter (1-2 sentences typically)," [ECF No. 54-27 at 1]; [ECF No. 74 ¶ 102]. In her email to Doe summarizing their conversation, Professor Taghian also stated, "I discussed that candidates with university probation have in the past elected to apply as an individual

applicant, and may obtain a chairperson's/Director's letter . . . the University probation would still be disclosed, but the letter would not have a vote on it." [ECF No. 65 ¶ 30]. Professor Taghian also emailed professor and Associate Vice Provost Joseph Burns ("Professor Burns") the next day stating that she had discussed with Doe that it might be worthwhile for Doe to apply to medical schools in the following cycle. [ECF No. 65 ¶ 29].

Doe authorized the Pre-Health Committee to write him a letter of evaluation, [ECF No. 65 ¶ 32], and sent Professor Taghian his own explanation of his institutional action on May 17, 2020, [id. ¶ 33]. Professor Taghian sent it to Associate Vice Provost Joseph Burns who responded, "BS," to which Professor Taghian responded, "I agree, but honestly, it's more than I expected." [ECF No. 74 ¶ 104]; [ECF No. 65-4]. On May 18, 2020, Burns emailed Professor Taghian stating, in part:

> I think this puts us in an even more touchy situation. Not only do we not believe [Doe] [w]e know that he did not change his behavior and was facing charges until they got bargained away, but cannot say that. Do we get a separate description from student affairs that we need to consider? We will certainly have to run it by [Boston College's legal counsel].
>
> Of course the immediate question unanswered is what was the reason for the stay away order in the first place. The schools will be expecting us to answer that in our letter if [Doe] does not own up to it. . . .
>
> We knew this would be a challenge. . . .

[ECF No. 74 ¶ 105]; [ECF No. 65-5]. On May 19, 2020, the Pre-Health Committee met to discuss Doe's application and voted unanimously to "present for consideration" Doe's qualifications, which is technically the lowest of the Committee's four options.[2] [ECF No. 65

[2] Professor Taghian stated in her deposition that "present for consideration" is the lowest of the Committee's options, but that in her opinion "in some ways" it is a "better vote than recommend with reservation, the [option] above it." [ECF No. 65 ¶ 35].

¶¶ 34–35]. On June 23, 2020, Professor Taghian emailed Doe, informing him that "the Committee complied with instructions that their description of the conduct record states that [Doe was] on university probation for a semester for [his] failure to comply with a University directive." [ECF No. 74 ¶ 107]. In her deposition, Professor Taghian testified that she had never seen the May 19 Agreement. [Id. ¶ 108].

In July 2020, Doe and Professor Taghian exchanged several emails, and on July 9, 2020, Doe emailed Professor Taghian to discuss a "backup plan in case [he didn't] get into medical school for entry in the fall of 2021." [ECF No. 65 ¶ 37]. On July 15, 2020, Doe emailed Professor Taghian that he had been "thinking of trying to get more experience as well." [Id.]. On July 26, 2020, Doe emailed Professor Taghian stating that he was "a bit concerned" that his statistics would be "too low for any good programs in Chemistry or any medical school." [Id. ¶ 38]. Professor Taghian responded, "I think your medical school application would benefit from clinical care, so if you could obtain a patient-centered position you'd be a stronger candidate," and, "I would choose your gap year of work depending on which you are more drawn to, M.D. programs or PhD/chem programs." [Id.]. Doe responded, "[D]o you think that I should do a post bacc to get my low GPA up." [ECF No. 54-28 at 1].

4. Doe's Year 1 Application Cycle

Doe applied to thirty medical schools in 2020 ("Year 1") for entry in the fall of 2021, [ECF No. 65 ¶ 39], and at Doe's request, Boston College submitted a package of letters to medical schools in connection with the applications, [id. ¶ 40]. The Association of American Medical Colleges operates a central portal for applicants to submit their medical school applications (the "AMCAS"). [Id. ¶ 41]. The AMCAS application requires students to disclose

if they have received an institutional action. [Id. ¶ 42]. In his Year 1 AMCAS application, Doe included the following language regarding his institutional action:

> A notice was given that a part of the chemistry department was inaccessible. The notice did not specify a time frame. It was the end of the semester and I had information that I needed with regards to my work in the department. Unfortunately, I accessed a part of the department that was restricted, gathered my data and left. I was identified and found responsible for failure to comply and was placed on one semester probation. This occurred during a time of duress and confusion in my life. My grandparents, who helped raise me, were admitted to the hospital multiple times that semester for serious illnesses. In addition I had lost a friend to whom I would confide a lot of my concerns. These are not excuses but rather set the stage for my mind set during this time. It's odd that I find myself in this position because I always considered myself a rule follower. But during this time and in this instance I showed a true lapse of judgment. Since this occurred I think of it often and it is associated with strong feelings of regret and remorse. I wish I could go back in time so that I could fix my error. I have learned from this experience mostly the importance of paying attention to directives.

[ECF No. 54-1]; [ECF No. 65 ¶ 43]. Doe testified in his deposition that the reference to the notice about a part of the Chemistry Department being inaccessible was "the cover story we gave for the institutional action." [ECF No. 65 ¶ 44]. Doe's description of his institutional action in his medical school applications did not reference the allegations that he repeatedly failed to comply with the stay away order. [Id. ¶ 45].

Doe has identified Temple SOM as the only medical school of relevance in this litigation. [ECF No. 65 ¶ 48]; [ECF No. 54-20 at 6]. Doe's mother is an alumna of Temple SOM and worked in St. Luke's Hospital, which is affiliated with Temple SOM, and was formerly a member of the Temple SOM admissions committee. [ECF No. 65 ¶¶ 49, 52]. On July 31, 2020, the Office of Admissions at Temple SOM asked Boston College for more information regarding the institutional action and specifically requested that Boston College "outline the details of the [institutional action] and the outcome of the institutional process." [Id. ¶ 50]. In compliance with the May 19 Agreement, Boston College responded to Temple SOM's request by sending a

letter listing Doe's violation as "Failure to Comply" and sanction as "University Probation (one semester)." [Id. ¶ 51]; [ECF No. 54-35].

On October 11, 2020, Professor Joel Rosenfeld at Temple SOM emailed Maria Zimmerman, a screener in the Temple SOM admissions office, and informed her of Doe's status as the son of a former St. Luke's Hospital physician and admissions committee member and stated that they would want to interview him. [ECF No. 65 ¶ 52]. Dr. Howard Levin, a member of the Temple SOM admissions committee, was Doe's primary interviewer in connection with his Year 1 application and interviewed him on December 1, 2020. [Id. ¶ 53].

In Dr. Levin's evaluation, he stated that Doe had the "intelligence level to do well given his strong scores on standardized testing" but that he "struggled academically in his undergraduate coursework with a relatively low GPA in [his] junior and senior years." [ECF No. 65 ¶ 54]. In his evaluation, Dr. Levin also stated that Doe's GPA was lower than applicants typically accepted, that they usually aimed for a 3.7 science GPA, that Doe's C minus at Muhlenberg College indicated that he almost failed the class, and that in most applications, students do not have any grades lower than a B minus. [Id. ¶ 55]. Dr. Levin's interview evaluation also states that Doe lacked emotional connectedness, failed to bring up his institutional action until asked, minimized the seriousness of it, and that his explanation did not feel "overly remorseful and seemed to minimize the extent of his transgressions." [ECF No. 54-32].

Dr. Levin voted to reject Doe's application in Year 1, and he testified that when he recommended that Doe's application be rejected he had not spoken with anyone else about Doe's application and that no one had attempted to influence his recommendation. [ECF No. 75-3 at 10–11]. In his deposition, Dr. Levin summarized his reasons for rejecting Doe's Year 1

application to Temple SOM, including Doe's poor interpersonal skills, poor communication skills, lack of empathy, failure to adequately explain or take responsibility for the institutional action, and negative qualities suggested in his recommendation letters. [ECF No. 65 ¶ 56]. In his deposition, Dr. Levin was asked, "[B]ased on learning that [Doe] had received university probation and that he left Boston College, did you believe that whatever happened was serious?" to which Dr. Levin responded, "Yes." [ECF No. 75-3 at 7]. When asked whether he believed he gave Doe a chance to fully explain the probation, Dr. Levin responded, "Yes." [Id.]. When asked whether he thought Doe's answers were adequate, Dr. Levin responded, "No." [Id.].

Dr. Rosenfeld was Doe's Temple SOM "blind" reviewer in Year 1, and knew only Doe's name prior to interviewing him. [ECF No. 74 ¶ 112]; [ECF No. 65 ¶ 111]. Dr. Rosenfeld awarded Doe 14 out of 15 points for his interview, but noted that he was an "average candidate" and recommended him for the waitlist. [ECF No. 65-7 at 3].

Doe's mother also had multiple conversations with a friend who was also a member of Temple SOM's admissions committee, referred to here as Dr. P,[3] regarding Doe's applications. [ECF No. 74 ¶ 121]. Doe's mother testified that Dr. P had told her that "Temple Main had called the admissions committee" and that Temple University ("Temple Main") had been informed that Doe and his mother "have legal action against Boston College."[4] [Id. ¶ 122]; [ECF No. 65-9 at 3].

---

[3] The parties have agreed to refer to Doe's mother's friend on the Temple SOM admissions committee as Dr. P for privacy reasons. The Court will do so as well.

[4] Boston College argues that this evidence is inadmissible hearsay, and that the conversation in question occurred after Doe had been rejected from Temple SOM in Year 1. [ECF No. 74 ¶ 122].

Temple SOM rejected Doe's Year 1 application. [ECF No. 65 ¶ 57]. The school received over 14,000 applications that year.[5] [Id.]. Doe was also rejected from all 29 other medical schools he applied to in Year 1. [Id. ¶ 58].

5. Doe's Year 2 Application Cycle

In 2021 ("Year 2"), Doe applied to 45 medical schools for entry in Fall 2022, including 24 schools to which he had not previously applied. [ECF No. 65 ¶ 59]. Upon Doe's request, Boston College again submitted a package of letters to medical schools on his behalf. [Id. ¶ 60]. Between Year 1 and Year 2, Professor Taghian removed from Doe's Pre-Health Committee letter some of the language concerning Doe's institutional action and Doe's explanation of the action. [Id. ¶ 62]. Doe's Year 2 AMCAS application still contained his description of the institutional action. [Id. ¶ 65]. In his Year 2 application cycle, Doe received interviews at Temple SOM, Seton Hall, Nova, and Georgetown University. [ECF No. 65 ¶ 66].

Professor Pamela Abrams ("Dr. Abrams") from Temple SOM was Doe's Year 2 primary interviewer, and she interviewed Doe on February 15, 2022. [ECF No. 65 ¶ 67]. In her evaluation, Dr. Abrams stated that she did not believe Doe belonged in medical school due to his poor communication skills. [Id. ¶ 68]. She specified that Doe was unable to explain a paper he wrote on physician burnout, he made no eye contact during the interview, and she was uncomfortable that he could not explain his institutional action in a way that made sense to her. [Id. ¶¶ 68–69]. Following her interview of Doe, Dr. Abrams reached out to Boston College's Office of Student Conduct to obtain more information regarding Doe's institutional action. [Id. ¶ 70]. Boston College responded to Dr. Abrams by stating, "please be advised that [Doe] was

[5] Temple SOM enrolls approximately 200 students at their main campus and 40 students at their branch campus per year. [Id. ¶ 74].

found responsible for failure to comply with a university directive, and completed one semester of university probation. We are unable to provide you with any further information." [ECF No. 54-37 at 2]. Boston College also responded to Temple SOM's request for disciplinary information by sending a letter stating only that Doe had been found responsible for "failure to comply" and had served one semester of university probation. [ECF No. 65 ¶ 72].

Doe was rejected by all four medical schools that interviewed him in Year 2, including Temple SOM. [Id. ¶ 66]. Temple SOM received over 10,000 applications in the 2021-2022 application cycle. [ECF No. 65 ¶ 73]. On June 4, 2022, Professor Taghian emailed Doe stating that because "medical school interviews are granted to only a few hundred students out of several thousands who apply to each school[,] . . . [b]eing rejected from a school post-interview suggests that you need to reflect on how you handled yourself in the interviews and identify how to improve the impression you make in that setting." [ECF No. 54–30 at 10].

6. Doe's Year 3 Application Cycle

In 2022 ("Year 3"), Doe applied to 39 allopathic ("MD") medical school programs and 10 osteopathic ("DO") medical school programs for entry in 2023. [ECF No. 65 ¶ 76]. Boston College again submitted a package of letters to schools on behalf of Doe. [Id. ¶ 77]. In his AMCAS application for Year 3, Doe included a different explanation for his institutional action, stating, in part:

> During the Spring semester of 2019, I was found responsible for failure to comply with a university directive and placed on university probation for one semester. Throughout 2019, I was heavily involved in research and the chemistry department in general. I received a notice that a part of the chemistry department was restricted and despite this notice accessed it to obtain data that at the time seemed important to me. This was a selfish mistake that did not take into consideration the concerns of the department or college. This was a singular incident and I have never had another violation.

[ECF No. 54-3 at 3]. During Year 3, Doe was accepted into the DO program at Lake Erie College of Medicine ("Lake Erie"), the Campbell University Jerry M. Wallace School of Osteopathic Medicine, and West Virginia School of Osteopathic Medicine. [ECF No. 65 ¶ 80]. Temple SOM did not grant Doe an interview in Year 3 and rejected his Year 3 application. [Id. ¶ 82–83].

Doe enrolled at Lake Erie, and as of March 10, 2025, had an overall GPA of 3.78 and ranked third in his group of 27 students. [ECF No. 65 ¶ 84]. Doe anticipates that he will graduate from Lake Erie in 2027. [Id. ¶ 86].

During his deposition, Doe stated that Temple SOM is ranked similarly to Lake Erie, and that Lake Erie graduates "match pretty decently," are "really punching above their weight," and the program "got exceptional outcome accreditation this past year." [ECF No. 65 ¶¶ 81, 85]. Doe hopes to pursue a career as a Hematologist/Oncologist, which would require him to match into a three-year internal medicine residency and then complete a three-year Hematology/Oncology fellowship. [Id. ¶¶ 88, 89]. Students at osteopathic programs can apply for residencies through the Electronic Residency Application Service and "match" in the same way as students from allopathic programs. [Id. ¶ 91]. Students at both Temple SOM and Lake Erie obtain residencies in Family Medicine, Internal Medicine, Pediatrics, and other fields. [Id. ¶ 92].

### B. Procedural History

Doe filed his original complaint on November 11, 2023. [ECF No. 1]. On November 22, 2023, he moved to proceed under a pseudonym. [ECF No. 9]. After briefing by both parties, the Court granted Doe's motion. [ECF No. 16]. Doe then filed his Amended Complaint on March 22, 2024, [ECF No. 17], and Boston College answered the Amended Complaint on May 6, 2024,

[ECF No. 22]. On September 9, 2025, Boston College moved for summary judgment, [ECF No. 51], and to strike Walstra's expert testimony, [ECF No. 48]. On October 14, 2025, Doe opposed Boston College's motion to strike Walstra's testimony, [ECF No. 59], and moved to strike portions of Professor Taghian's affidavit, [ECF No. 60]. Doe opposed Boston College's motion for summary judgment on October 15, 2025. [ECF No. 64]. On November 12, 2025, Boston College filed a reply in support of its motion for summary judgment, [ECF No. 73], opposed Doe's motion to strike portions of Professor Taghian's affidavit, [ECF No. 76], and moved to strike portions of Doe's statement of facts, [ECF No. 78]. On December 5, 2025, Doe opposed Boston College's motion to strike portions of his statement of facts, [ECF No. 85], and filed a reply in support of his motion to strike portions of Professor Taghian's affidavit, [ECF No. 84].

## II. MOTIONS TO STRIKE

### A. Legal Standard

The Court construes the parties' motions to strike, [ECF Nos. 48, 60, 78], as objections under Federal Rule of Civil Procedure 56(c)(2), see Bergus v. Florian, No. 18-cv-10323, 2022 WL 7670168, at *1 n.1 (D. Mass. Oct. 13, 2022) (citing Suzuki v. Abiomed, Inc., No. 16-cv-12214, 2019 WL 109340, at *7 (D. Mass. Jan. 4, 2019)). Under Fed. R. Civ. P. 56, "[a] party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2).

### B. Motion to Strike Portions of Doe's Statement of Facts

Boston College has moved to strike from Doe's Responses and Further Statement of Undisputed Material Facts, [ECF No. 65 ("Doe's Statement of Facts")], and Memorandum in Opposition to Boston College's Motion for Summary Judgment, [ECF No. 64 ("Opposition")], certain statements regarding Boston College employees that Boston College claims are

immaterial, scandalous, and have been previously stricken by the Court pursuant to Federal Rule of Civil Procedure 12(f). [ECF No. 79 at 1, 3]. Doe contends that Rule 12(f) applies to pleadings, not the summary judgment record, and that the statements at issue are relevant and in compliance with the Court's previous order. [ECF No. 85 at 1–2].

Federal Rule of Civil Procedure 12(f) provides that the Court may strike from a pleading "any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). Rule 12(f) does not, however, apply to summary judgment motions or oppositions. Minahan v. Town of East Longmeadow, No. 12-cv-30203, 2014 WL 1652646, at *2 (D. Mass. Apr. 22, 2014) (citing Pilgrim v. Trs. of Tufts Coll., 118 F.3d 864, 868 (1st Cir. 1997), abrogated on other grounds by Crowley v. L.L. Bean, Inc., 303 F.3d 387 (1st Cir. 2002)).

The Court previously granted Boston College's motion to strike certain language, predominantly facts that could lead to the identification of non-parties, from Doe's complaint and ordered that all future filings should refrain from including similar details about non-parties. [ECF No. 16 at 7–8]. The Court held that this information was not necessary for Doe to prove his claims, and that it would prejudice Boston College by forcing it to defend non-parties against scandalous allegations unrelated to the merits of the claims at issue. [Id.]. The Court also noted that Doe is entitled to provide some background information as to how the May 19 Agreement came about. [Id. at 7].

The portions of Doe's Statement of Facts and Opposition that Boston College seeks to strike do not contain the type of identifying information that Doe was previously required to remove from the record. See [ECF No. 64 at 1, 2–3]; [ECF No. 65 ¶¶ 94–96]. Boston College has also failed to identify any basis other than Rule 12(f), which only applies to pleadings, to strike these allegations. See [ECF No. 79]. The challenged allegations do not include any

identifying information of the type that the Court previously prohibited, and the Court is fully capable of evaluating the relevancy of the allegations in the context of Boston College's motion for summary judgment. Accordingly, Boston College's motion to strike portions of Doe's statement of facts and opposition brief is **DENIED**.

### C. Motions to Strike Portions of Professor Taghian's Testimony

Doe has moved to strike paragraphs 10 and 14 through 19 of Professor Taghian's affidavit, [ECF Nos. 55, 60], arguing that paragraph 10 asserts facts inconsistent with her deposition testimony and that the statements in paragraphs 14 through 19 are not based on her personal knowledge and contain expert opinions that she was not designated to provide or qualified to render. [Id.].

Doe claims that Professor Taghian's statement that Doe did not show her his explanation of the institutional action at DOE000318 before or after he sent it to medical schools, [ECF No. 55 ¶ 10], contradicts her deposition testimony, in which she stated that she reviewed Doe's explanation of the institutional action, [ECF No. 61-1 at 3–5]; [ECF No. 60 at 2]. Boston College argues that the explanation that Professor Taghian was shown during her deposition was the explanation Doe sent to the Pre-Health Committee for inclusion in their letter, rather than the explanation that he included in his AMCAS application, DOE000318, which was the document referenced in Professor Taghian's affidavit. [ECF No. 76 at 7]. As Doe concedes in his reply in support of his motion to strike, the two different descriptions are not identical.[6] [ECF No. 84 at

---

[6] Doe's Year 1 AMCAS explanation is quoted supra page 8. The explanation that Doe provided to Professor Taghian for the Pre-Health Committee letter was as follows:

> I was found responsible for failure to comply with a university directive. This occurred during a time of duress and confusion in my life. My grandparents, who

3]. The different versions of the explanation were also used for two different purposes, and it is unclear whether or how Professor Taghian would know if Doe's AMCAS explanation was the same as what she received for the Pre-Health Committee letter. As such, the Court does not find that the alleged contradiction warrants striking paragraph 10 of Professor Taghian's affidavit.

Paragraphs 14 through 19 of Professor Taghian's affidavit contain information that is related to Doe's career outcomes and trajectory. Doe contends both that this information is not based on Professor Taghian's personal, firsthand knowledge, and therefore cannot be set forth in an affidavit presented in connection with a summary judgment motion, [ECF No. 61 at 2], and that Professor Taghian lacks sufficient qualifications to provide expert testimony, [id. at 4]. Boston College responds that Professor Taghian has gained relevant firsthand knowledge while advising pre-health students at Boston College, so her affidavit is admissible under Federal Rule of Evidence 701, [ECF No. 76 at 1], and that her affidavit does not contain an expert opinion, [id. at 3].

"If a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is: (a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on

---

> helped raise me, were admitted to the hospital multiple times that semester for serious illnesses. In addition I had lost a friend to whom I would confide a lot of my concerns. These are not excuses but rather set the stage for my mind set during this time. It's odd that I find myself in this position because I always considered myself a rule follower. I have never really been in trouble and I can honestly say I don't care for how it makes me feel. But during this time and in this instance I showed a true lapse of judgment. Since this occurred I think of it often and it is associated with strong feelings of regret and remorse. I wish I could go back in time so that I could fix my error. This has had a painfully negative effect on my life. While this has been a negative experience, I have learned from it.

[ECF No. 54-8].

scientific, technical, or other specialized knowledge within the scope of Rule 702." Fed. R. Evid. 701. Lay witnesses are permitted to offer opinion testimony that is based on their "experiential expertise," including "knowledge gained through work experience" if it is "well founded on personal knowledge and susceptible to cross-examination." Wade v. Touchdown Realty Grp., LLC, 386 F. Supp. 3d 56, 63 (D. Mass. 2019) (quoting United States v. Vega, 813 F.3d 386, 394 (1st Cir. 2016)). "Rule 701 . . . is meant to admit testimony based on the lay expertise a witness personally acquires through experience, often on the job." United States v. Maher, 454 F.3d 13, 24 (1st Cir. 2006); see Vega, 813 F.3d at 395 (finding that opinions based on technical understanding of Medicare laws and regulations fell outside the bounds of lay expertise).

Professor Taghian testified that she was the chair of Boston College's Pre-Health Committee for six years and that during that time she advised students who later attended both MD and DO medical schools and thereby has become familiar with the career outcomes for MD and DO students. [ECF No. 55 ¶¶ 1, 11, 13]. Paragraphs 14 through 19 of Professor Taghian's affidavit then provide limited, basic information regarding the process of matching for residencies and the ability of DO students, including those at Lake Erie, to pursue residencies in fields such as Family Medicine, Internal Medicine, and Pediatrics. [Id. ¶¶ 14–18]. She also mentions that a Hematology/Oncology fellowship occurs after an internal medicine residency and lasts three years. [Id. ¶ 19]. The Court finds that Professor Taghian's testimony at paragraphs 14 through 19 of her affidavit, [id. ¶¶ 14–19], is rationally based on her perception, is helpful in determining a fact in issue, namely causation and damages, and is not based on any scientific, technical, or other specialized knowledge within the scope of Rule 702. Her statements are based on knowledge she obtained advising students on the medical school

admissions process, and the subject matter of her testimony is not specialized or technical, but basic, commonly known information regarding the medical school and residency application process.

For the foregoing reasons, Doe's motion to strike the testimony of Professor Taghian, [ECF No. 60], is **DENIED**.

### D. Motion to Strike Walstra's Expert Testimony

Walstra, who completed higher education in the Netherlands before receiving a master's degree in marketing from Webster University and several post-masters credits and certifications related to vocational economics, works as an economic and vocational consultant and runs Walstra Expert Witness Company, LLC. See [ECF No. 50-1 at 16]; [ECF No. 59-1 at 11]. Walstra's expert report concerns "the vocational and economic impact of admission decisions on John Doe's medical school admissions and career trajectory in . . . [this] matter." [ECF No. 50-1 at 1]. Boston College has moved to strike Walstra's expert testimony as speculative and unreliable. [ECF No. 48].

Federal Rule of Evidence 702 governs the admissibility of expert opinion evidence and provides as follows:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702. "Expert testimony may not be admitted unless the proponent demonstrates to the court that it is more likely than not that the proffered testimony meets the admissibility

requirements set forth in the rule." Fed. R. Evid. 702 advisory committee's note to 2023 amendment. "The amendments clarify that 'the critical questions of the sufficiency of an expert's basis, and the application of the expert's methodology, are questions of' admissibility, not weight." Sterlite Corp. v. Olivet Int'l, Inc., No. 22-cv-10327, 2024 WL 4349271, at *4 (D. Mass. Sep. 30, 2024) (citing Fed. R. Evid. 702 advisory committee's note to 2023 amendment).

"In applying Rule 702, a district court must principally determine whether the expert's proffered testimony both rests on a reliable foundation and is relevant to the task at hand." D'Pergo Custom Guitars, Inc. v. Sweetwater Sound, Inc., 111 F.4th 125, 140 (1st Cir. 2024) (citation modified). "'The focus' of the inquiry into the admissibility of expert testimony under Rule 702 'must be solely on principles and methodology, not on the conclusions that they generate.'" Rodríguez v. Hosp. San Cristobal, 91 F.4th 59, 70 (1st Cir. 2024) (quoting Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 595 (1993). "'When the factual underpinning of an expert's opinion is weak, it is a matter affecting the weight and credibility of the testimony' and thus 'a question to be resolved by the jury.'" Id. (quoting Milward v. Acuity Specialty Prods. Grp., Inc., 639 F.3d 11, 22 (1st Cir. 2011)). "[I]n assessing whether the expert opinion has the requisite validation for purposes of Rule 702, a court may conclude that it does not because, given the record at hand, 'there is simply too great an analytical gap between the data and the opinion proffered.'" Id. at 70–71 (quoting Gen. Elec. Co. v. Joiner, 522 U.S. 136, 146 (1997)). Further, under Daubert, an "expert's opinion [must] have a reliable basis in the knowledge and experience of his discipline." Daubert, 509 U.S. at 592.

First, Boston College contends that Walstra is not qualified to opine on career paths in the medical professions, potential career outcomes for DOs, the medical residency process, or future earnings of medical professionals. [ECF No. 49 at 6]. In support of this argument, Boston

College argues that Walstra has not served as an expert in any cases involving medical school, residency, or fellowship admissions or career prospects of physicians, and he has no training in those subjects. [Id. (citing ECF No. 50-1 at 16)]. Boston College also asserts that Walstra did not attempt to familiarize himself with the requirements or acceptance rates for medical school entry, the residency match process, or differences between MD and DO programs and career outcomes. [Id. at 7]. They also cite to evidence from Walstra's deposition in which he stated that he was unaware of what "match rates" mean and was unaware that MD and DO students have gone through the same residency match process since 2020. [Id. (citing ECF No. 50-2 at 7, 24)]. Boston College also points out that Walstra did not review Doe's deposition testimony or discuss certain information with him, including his recommendation letters, the Institutional Action, or his medical school interviews. [Id. at 8 (citing ECF No. 51-2 at 6, 8, 25)].

In response, Doe asserts that Walstra is a "seasoned vocational-economic consultant" who focuses on lost earning capacity, work-life expectancy, and vocational outcomes, and that he was not retained to opine on Doe's medical school admissions or residency placement. [ECF No. 59 at 3]. Instead, Doe claims that Walstra was engaged to provide a valuation of Doe's economic damages, [id. at 4], and that "[e]conomists and vocational experts are routinely permitted to model earning trajectories for professions in which they are not licensed as long as they rely on reliable data sources," [id. at 5].

"[I]t is the responsibility of the trial judge to ensure that an expert is sufficiently qualified to provide expert testimony that is relevant to the task at hand and to ensure that the testimony rests on a reliable basis." Beaudette v. Louisville Ladder, Inc., 462 F.3d 22, 25 (1st Cir. 2006). To the extent that Walstra's expert report and testimony concerns the economic impact of a student with Doe's general characteristics experiencing a two-year delay in starting medical

school and general differences in earning potential between oncology and family practice, the Court finds that Walstra's prior experience as an earnings expert demonstrates that he is sufficiently qualified to perform such an economic analysis. The Court finds, however, that Walstra does not have the requisite training or experience to opine on probable admissions or career outcomes in the context of medical education, such as the consequences that attendance at a DO program might have for Doe's career trajectory and residency or fellowship acceptances. Boston College has set forth evidence that Walstra has no background or experience in the area of medical school admissions or the residency match process, and he was not aware of basic information regarding the residency match program.

Next, Boston College argues that Walstra's analysis is speculative and has no factual foundation. [ECF No. 49 at 9]. First, it contends that Walstra's economic analysis is speculative because he assumes that but for Boston College's alleged breach, Doe would have been admitted into an MD program and would have become either an oncologist or family practitioner. [Id. at 10]. Boston College further avers that these outcomes are uncertain and that Doe must jump through many hoops to obtain gainful employment, including interviewing for residency programs. [Id. at 11]. Second, Boston College argues that the average age of entering medical students is 25, which undermines the delay aspect of Walstra's damages theory,[7] and that he fails to account for the education and experience that Doe gained during his two year "gap" before entering medical school. [Id. at 12–13]. Third, Boston College argues that Walstra's economic

[7] The Court notes that Boston College's argument regarding the average age of entering medical students makes little sense. Simply because the average student enrolls in medical school two years after completing their undergraduate education does not weigh on whether Doe would have suffered economic damage from entering medical school two years later than he anticipated.

analysis does not account for Doe "making up" for the two-year delay by working for an additional two years. [Id. at 13].

In response, Doe contends that these pieces of information are all assumptions that Walstra used in his analysis, and that these assumptions are set forth in his report such that the parties and the Court can evaluate his conclusions. [ECF No. 59 at 7]. He also argues that Walstra is not predicting the exact specialty that Doe will pursue or obtain, but rather modeling alternative scenarios to illustrate the economic impact of different career outcomes. [Id.]. The Court finds that Walstra's report and opinion regarding the economic impact of different potential career outcomes that Doe could achieve is sufficiently based on the facts of the case, and therefore satisfies the requirements of Rule 702. Fed. R. Evid. 702 ("A witness who is qualified as an expert . . . may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that . . . the testimony is based on sufficient facts or data.). Although Boston College disputes the some of those facts, "[d]isputed facts may serve as the basis for expert testimony." Neural Magic, Inc. v. Meta Platforms, Inc., 659 F. Supp. 3d 138, 177 (D. Mass. 2023); Crowe v. Marchand, 506 F.3d 13, 18 (1st Cir. 2007) ("Objections . . . which question the factual underpinnings of an expert's investigation, often go to the weight of the proffered testimony, not to its admissibility."); United States ex rel. Dyer v. Raytheon Co., No. 08-cv-10341, 2013 WL 5348571, at *9 (D. Mass. Sep. 23, 2013) ("[D]isputes over the facts on which an expert bases his opinions go to the weight of the testimony, not its admissibility."). The challenges raised by Boston College go to the weight and credibility of Walstra's testimony, not its threshold admissibility.

Lastly, Boston College argues that Walstra's methodology is unreliable because he based his economic projections on average rather than median salaries. [ECF No. 49 at 14]. Doe

contends that this issue pertains to the selection of data to be used within an accepted methodology, not the soundness of the methodology itself. [ECF No. 59 at 8]. The Court agrees with Doe that Walstra's methodology was sufficient under Rule 702, and moreover, Walstra amended his report at Boston College's request to incorporate more detailed data on residency and fellowship wages. See [ECF No. 50-3 at 1].

Accordingly, Boston College's motion to strike, [ECF No. 48], is **GRANTED IN PART**, and Walstra's expert report and testimony is struck to the extent that he opines on how Doe's attendance at a DO program, as opposed to a MD program, might have impacted his residency or fellowship acceptances.[8] Boston College's motion to strike is otherwise **DENIED**.

## III. MOTION FOR SUMMARY JUDGMENT

### A. Legal Standard

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). An issue is considered "genuine" when "the evidence of record permits a rational factfinder to resolve it in favor of either party." Borges ex rel. S.M.B.W. v. Serrano-Isern, 605 F.3d 1, 4–5 (1st Cir. 2010) (citing Medina-Muñoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990)). A fact is considered "material" when "its existence or nonexistence has the potential to change the outcome of the suit." Id. at 5 (citing Martínez v. Colón, 54 F.3d 980, 984 (1st Cir. 1995)).

[8] The Court notes that it appears that Walstra's economic impact analysis does not differentiate between oncologists or family practitioners who attended MD versus DO programs. See [ECF No. 50-1 at 10–13].

"To succeed in showing that there is no genuine dispute of material fact, the moving party must direct [the Court] to specific evidence in the record that would be admissible at trial." Ocasio-Hernández v. Fortuño-Burset, 777 F.3d 1, 4 (1st Cir. 2015). "That is, it must 'affirmatively produce evidence that negates an essential element of the non-moving party's claim,' or, using 'evidentiary materials already on file . . . demonstrate that the non-moving party will be unable to carry its burden of persuasion at trial.'" Id. at 4–5 (quoting Carmona v. Toledo, 215 F.3d 124, 132 (1st Cir. 2000)). Once the moving party has laid out its basis for summary judgment, the burden shifts to the party opposing summary judgment to demonstrate, "with respect to each issue on which she would bear the burden of proof at trial . . . that a trier of fact could reasonably resolve that issue in her favor." Borges, 605 F.3d at 5 (first citing Celotex Corp. v. Catrett, 477 U.S. 317, 323–24 (1986); and then citing DeNovellis v. Shalala, 124 F.3d 298, 306 (1st Cir. 1997)).

On a motion for summary judgment, the Court reviews "the entire record in the light most hospitable to the party opposing summary judgment." Podiatrist Ass'n, Inc. v. La Cruz Azul de P.R., Inc., 332 F.3d 6, 13 (1st Cir. 2003) (quoting Griggs-Ryan v. Smith, 904 F.2d 112, 115 (1st Cir. 1990)). Where inferences are to be drawn from the proffered facts, those inferences "must be viewed in the light most favorable to the party opposing the motion." Oleskey ex rel. Boumediene v. U.S. Dep't of Def., 658 F. Supp. 2d 288, 294 (D. Mass. 2009) (quoting Founding Church of Scientology of Wash., D.C., Inc. v. Nat'l Sec. Agency, 610 F.2d 824, 836 (D.C. Cir. 1979)). The First Circuit has noted that this standard "is favorable to the nonmoving party, but it does not give him a free pass to trial." Hannon v. Beard, 645 F.3d 45, 48 (1st Cir. 2011). "The factual conflicts upon which he relies must be both genuine and material," Gomez v. Stop & Shop Supermarket Co., 670 F.3d 395, 397 (1st Cir. 2012), and the court may discount

"conclusory allegations, improbable inferences, and unsupported speculation," Cochran, 328 F.3d at 6 (quoting Medina-Muñoz, 896 F.2d at 8). Further, "[t]he mere existence of a scintilla of evidence in support of [the non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986).

**B. Breach of Contract (Count I)**

In his Amended Complaint, Doe brings a claim for breach of contract alleging that Boston College breached the May 19 Agreement by disclosing information about Doe's disciplinary record that it agreed not to provide or, alternatively, providing the Temple SOM admissions committee information about Doe's disciplinary record that was false or misleading. [Am. Compl. ¶¶ 124–30]. Boston College now moves for summary judgment, arguing that there was no breach of the May 19 Agreement, Doe has not shown causation, and Doe has failed to establish any damages. [ECF No. 52 at 2–3].

"Under Massachusetts law, a breach of contract claim requires the plaintiff to show that (1) a valid contract between the parties existed, (2) the plaintiff was ready, willing, and able to perform, (3) the defendant was in breach of the contract, and (4) the plaintiff sustained damages as a result." Bose Corp. v. Ejaz, 732 F. 3d 17, 21 (1st Cir. 2013) (citing Singarella v. City of Boston, 173 N.E.2d 290, 291 (Mass. 1961)). Here, neither party disputes the existence of an enforceable contract, so the Court will address only the third and fourth elements.

Under the May 19 Agreement, Boston College agreed to the following with respect to disclosure of information about Doe's institutional action:

> With respect to [Doe's] conduct record or disciplinary history, consistent with federal and state law, Boston College and its employees may only disclose in response to third-party inquiries concerning [Doe's] disciplinary record the single disciplinary finding reflected on [Doe's] conduct record from May 2019. With

> respect to that incident Boston College and its employees will comment only: "Mr. [Doe] was found responsible for failure to comply with a university directive, and completed one semester of university probation."

[ECF No. 54-15 at 1–2]. Doe argues that Boston College breached the May 19 Agreement in three different ways.

1. July 2, 2020 Pre-Health Committee Letter

First, Doe argues that Boston College violated the May 19 Agreement by including additional language regarding Doe's institutional action in his Year 1 Pre-Health Committee Letter. [ECF No. 64 at 7]. The committee letter stated, in relevant part,

> During [Doe's] junior year he developed a dependency on an instructor, which resulted in him making excessive demands on her time and attention. . . . [Doe] finished his undergraduate career off campus in Pennsylvania at a state university and the University of Pennsylvania. After he was placed on "university probation" for a semester following for his failure to comply with a University directive, [Doe] petitioned to be able to finish his senior year course work off campus, and the Dean agreed that this would be the best arrangement for all concerned.

[ECF No. 54-5 at 2]. The letter further states,

> As he notes in his own explanation, he recognizes that he used poor judgment in violating the order and says he has learned his lesson. Indeed, like many students demonstrating similar social difficulties, he generally prefers specific directions and boundaries and is very careful about following rules. He feels badly that in this case he repeatedly violated the very specific instructions from the Dean of Students and now understands that his behavior was wrong. . . .
>
> Overall, [Doe] is an unusually bright student who has endured some social awkwardness throughout his career, but can work effectively in a research setting. Even by his own standards he knows that he violated specific university rules and we hope he will learn from that.

[Id.]. The letter then recites Doe's own explanation as follows,

> I was found responsible for failure to comply with a university directive. This occurred during a time of duress and confusion in my life. My grandparents, who helped raise me, were admitted to the hospital multiple times that semester for serious illnesses. In addition I had lost a friend to whom I would confide a lot of my concerns. These are not excuses but rather set the stage for my mind set during this time. It's odd that I find myself in this position because I always considered

> myself a rule follower. I have never really been in trouble and I can honestly say I don't care for how it makes me feel. But during this time and in this instance I showed a true lapse of judgment. Since this occurred I think of it often and it is associated with strong feelings of regret and remorse. I wish I could go back in time so that I could fix my error. This has had a painfully negative effect on my life. While this has been a negative experience, I have learned from it.

[Id. at 2–3].

Doe contends that the language that Boston College used in his Year 1 committee letter violated the May 19 Agreement because it deviated from the language required by the agreement and referenced underlying charges which Boston College agreed to dismiss and expunge. [ECF No. 64 at 7]. Doe also points out that Burns' email to Professor Taghian in which he states, "[w]e know that he did not change his behavior and was facing charges until they got bargained away, but cannot say that," shows that Boston College was aware of the limitations that the May 19 Agreement placed on the Pre-Health Committee's language in their letter. [Id. at 8]; [ECF No. 65-5 at 1].

Boston College contends that its obligations in the May 19 Agreement applied only in "in response to third-party inquiries." [ECF No. 52 at 12]; [ECF No. 54-15 at 1]. The school argues that this obligation did not apply to the Pre-Health Committee letter, and Doe was informed that the letter was optional and he could apply without one or with only a letter from the committee chairperson or director. [ECF No. 52 at 12]; [ECF No. 54-27 at 1]; [ECF No. 55 ¶ 5]. Boston College also contends that Professor Taghian communicated to Doe that the institutional action was a reportable event and would be briefly discussed in the committee letter. [ECF No. 52 at 12]; [ECF No. 54-27 at 1]. Doe elected to proceed with the full committee letter process and provided his explanation of the institutional action to the Pre-Health Committee. [ECF No. 55 ¶ 5].

With respect to Doe's Year 1 Pre-Health Committee Letter, the Court finds that Boston College did not breach the May 19 Agreement. "Under Massachusetts law, contract interpretation is a question of law suitable for resolution on summary judgment unless the Court finds that the terms of the contract are ambiguous." Minturn v. Monrad, 585 F. Supp. 3d 123, 127 (D. Mass. 2022). In determining whether ambiguity exists, "the court must first examine the language of the contract by itself, independent of extrinsic evidence," Farmers Ins. Exch. v. RNK, Inc., 632 F.3d 777, 783 (1st Cir. 2011) (quoting Nicolaci v. Anapol, 387 F.3d 21, 26 (1st Cir. 2004)), and the contract language should be "interpreted based upon its plain meaning while 'giving full effect to the document as a whole,'" Minturn, 585 F. Supp. 3d at 127 (quoting Given v. Com. Ins. Co., 796 N.E.2d 1275, 1277 (Mass. 2003)). The plain language of the May 19 Agreement clearly indicates that Boston College is limited in what it can disclose about Doe's conduct history "in response to third-party inquiries." [ECF No. 54-15 at 1–2]. To interpret the contract in a way that limits Boston College's disclosures more generally would render the "in response to third-party inquiries" language superfluous. Minturn v. Monrad, 64 F.4th 9, 18 (1st Cir. 2023) ("[I]t is important to avoid interpretations of contractual language that render a word superfluous or redundant.") (citing Starr v. Fordham, 648 N.E.2d 1261, 1270 (Mass. 1995)); see Jasty v. Wright Med. Tech., Inc., 528 F.3d 28, 36 (1st Cir. 2008) ("[C]onstructions that render contract terms meaningless should be avoided." (quoting Summit Packaging Sys., Inc. v. Kenyon & Kenyon, 273 F.3d 9, 12–13 (1st Cir. 2001))).

Doe barely rebuts this argument, contending only that the May 19 Agreement "expressly applied to Boston College and its employees." [ECF No. 64 at 7]. While that may be true, the May 19 Agreement's requirements for those employees only applied in response to third-party inquiries, and the Pre-Health Committee letter was not a disclosure in response to a third-party

inquiry because Doe himself requested that the letter be drafted and included in his application materials. [ECF No. 55 ¶ 5]. Accordingly, Boston College did not breach the May 19 Agreement by submitting the Pre-Health Committee letter to medical schools at Doe's request.

2. Disclosures to Temple Main

Second, Doe contends that Boston College breached the May 19 Agreement by disclosing prohibited information to Temple Main. [ECF No. 64 at 9]. In support of this allegation, Doe's mother testified that she had multiple conversations around April 2021 with Dr. P about Doe's applications, and that when Dr. P met with Temple SOM Dean Shaden Eldakar-Hein, the Dean told him that "Temple Main had called the admissions committee" and relayed more information to the admissions committee regarding Doe. [ECF No. 65-9 at 3–4].[9] Specifically, Doe's mother stated that Dr. P had spoken with the Dean and subsequently relayed to her that the Dean had told him that someone at Boston College had called someone at Temple Main and informed the university that Doe and his mother had ongoing legal action against Boston College, and then Temple Main contacted the medical school admissions committee. [Id.]. Dr. P also told Doe's mother that the admissions committee was informed that Doe had been suspended from Boston College. [Id.]. Doe's mother testified that Dr. P met with the Dean a second time, and Dr. P stated that the Dean had said that Doe "had every right to know all conduct that Boston College had against him and that the letters were protected."[10] [Id. at 4].

---

[9] The Court notes that in his Opposition several of Doe's citations to his statement of material facts appear to be incorrect. For example, Doe cites to paragraph 115 of his statement of material facts in support of this contention. [ECF No. 64 at 9]. Paragraph 115, however, relates to page 92 of Professor Levin's deposition, rather than Doe's mother's deposition. The Court will presume that the relevant underlying evidence is Doe's mother's deposition at Exhibit 9 of Doe's statement of facts. See [ECF No. 65-9].

[10] The record is unclear as to what letters Doe's mother was referencing.

Doe's mother also testified that Dr. P told her that Dr. Levin told him that Doe "kept going to the chemistry department multiple times despite multiple warnings. Was caught on videotape and suspended." [Id. at 8]. Doe's mother testified that she did not know who from Boston College contacted Temple University or which Temple Main employee they had contacted. [Id. at 6–7]. Doe argues that his mother's testimony establishes that someone at Boston College breached the May 19 Agreement by disclosing unauthorized information to Temple Main. [ECF No. 64 at 8–9].

Boston College argues that Doe's mother's testimony about her conversation with Dr. P is hearsay, and that the various other conversations among Dr. P, Dean Eldakar-Hein, someone from Temple University, a member (or members) of the Temple SOM admissions committee, and someone from Boston College, constitute double, triple, and even further hearsay and should be disregarded. [ECF No. 73 at 15]. "'It is black-letter law that hearsay evidence cannot be considered on summary judgment' for the truth of the matter asserted." Evergreen Partnering Grp., Inc. v. Pactiv Corp., 832 F.3d 1, 12 (1st Cir. 2016) (quoting Hannon v. Beard, 645 F.3d 45, 49 (1st Cir. 2011)). While "a district court may consider hearsay evidence submitted in an inadmissible form at the summary judgment stage where the content of the evidence proffered could later be provided in an admissible form at trial," SEC v. Ramírez, No. 15-cv-02365, 2018 WL 2021464, at *15 (D.P.R. Apr. 30, 2018), the Court does not find that exception to be applicable here. As Boston College points out, the conversations at issue here involve multiple layers of uncorroborated hearsay which is particularly unreliable because it involves multiple unknown parties. [ECF No. 73 at 15]; see Pardo Hernandez v. Citibank, 141 F. Supp. 2d 241, 245 (D.P.R. 2001) (stating that evidence was inadmissible hearsay and "inherently unreliable" when the speaker had not been identified). The generally unreliable nature of hearsay,

particularly double and triple hearsay, is highlighted here by the ambiguous and convoluted nature of Doe's mother's testimony concerning the conversations, see [ECF No. 65-9 at 3–4], as well as the fact that Doe sets forth no testimony from Dr. P, who was deposed in connection with this matter, see [ECF No. 75-4], corroborating Doe's mother's story. Doe does not contend that he can and will call these unidentified individuals from Boston College and Temple Main to testify at trial or that any exception to the hearsay rule would apply to make the statements admissible, and it is not clear to the Court that there is any viable way to introduce this evidence in admissible form. Accordingly, the Court will not consider the testimony at this stage of the litigation.

Additionally, Doe contends that Dr. Levin's comments regarding Doe's institutional action, namely that the probation was the result of "multiple serious transgressions, suspension, etc.," suggest that someone from Boston College provided Temple Main with additional information regarding Doe and that this information was passed to Temple SOM. [ECF No. 64 at 9]. In support of this allegation, however, Doe cites only the May 19 Agreement, and not to any specific statements from Dr. Levin. See [id.]. Furthermore, contrary to Doe's theory, Dr. Levin testified that when he recommended that Doe be rejected, he had not spoken with anyone else about Doe's application and that no one had tried to influence his decision. [ECF No. 75-3 at 10]. Dr. Levin also testified that he did not know how many times Doe violated the university order, but that based on Doe's own explanation of the institutional action, it was either "a serious transgression, or that there was more than one transgression." [Id. at 6]. Accordingly, the Court finds that there remains no dispute of material fact such that a reasonable juror could conclude that Boston College breached the May 19 Agreement by speaking with someone at Temple Main about Doe.

3. Boston College's Email Response to Dr. Abrams

Third, Doe argues that Boston College breached the May 19 Agreement when it responded to a request from Dr. Abrams, Doe's primary interviewer at Temple SOM in Year 2, by stating, "[Doe] was found responsible for failure to comply with a university directive, and completed one semester of university probation. We are unable to provide you with any further information." [ECF No. 64 at 10–11]; [ECF No. 65-10]. Doe claims that the second sentence stating that no further information could be provided deviated from what Boston College was permitted to say and it implied that Boston College possessed additional negative information about Doe. [ECF No. 64 at 11]. Boston College contends that the language was in compliance with the May 19 Agreement and that the second sentence was included because this was the second request that Boston College had received from Temple SOM. [ECF No. 73 at 11].

As stated above, "contract interpretation is a question of law suitable for resolution on summary judgment unless the Court finds that the terms of the contract are ambiguous." Minturn, 585 F. Supp. 3d at 127. Here, pursuant to the May 19 Agreement, Boston College agreed to not disclose certain details of Doe's dismissed and expunged case in response to third-party inquiries, and, "[w]ith respect to that incident" to say no more than the agreed upon language. [ECF No. 54-15 at 1–2]. By responding that it could not reveal any further information, Boston College did not disclose any additional information concerning "that incident," [id. (emphasis added)], i.e., Doe's institutional action, and, therefore, abided by the terms of the May 19 Agreement. Accordingly, the Court finds that Boston College's response to

Dr. Abram's email request did not breach the May 19 Agreement and, in sum, Boston College's motion for summary judgment on Doe's breach of contract claim is **GRANTED**.[11]

### C. Breach of the Implied Covenant of Good Faith and Fair Dealing Claim (Count II)

In Count II of his Amended Complaint, Doe alleges that Boston College breached the implied covenant of good faith and fair dealing because "[b]y and through its actions and communications with [Temple SOM's] admissions committee, [Boston College] unfairly prevented Doe from receiving the benefits he was entitled to under the [May 19] Agreement." [Am. Compl. ¶¶ 131–138].

Under Massachusetts law, every contract carries with it an implied covenant of good faith and fair dealing. Anthony's Pier Four, Inc. v. HBC Assocs., 583 N.E.2d 806, 820 (Mass. 1991). "The covenant of good faith and fair dealing requires that 'neither party shall do anything that will have the effect of destroying or injuring the right of the other party to the fruits of the contract.'" T.W. Nickerson, Inc. v. Fleet Nat'l Bank, 924 N.E.2d 696, 704 (2010) (quoting Anthony's Pier Four, Inc., 583 N.E.2d at 820). "The scope of the covenant is only as broad as the contract that governs the particular relationship." Ayash v. Dana-Farber Cancer Inst., 822 N.E.2d 667, 684 (Mass. 2005). "As a consequence, the implied covenant cannot 'create rights and duties not otherwise provided for in the existing contractual relationship . . . .'" Young v. Wells Fargo Bank, N.A., 717 F.3d 224, 238 (1st Cir. 2013) (quoting Ayash, 822 N.E.2d at 684). "The essential inquiry is whether the challenged conduct conformed to the parties' reasonable understanding of the performance obligations, as reflected in the overall spirit of the

---

[11] Because the Court has granted summary judgment based on the breach element of Doe's breach of contract claim, the Court need not discuss the causation or damages elements for Count I.

bargain. . . ." Shaulis v. Nordstrom Inc., 120 F. Supp. 3d 40, 55 (D. Mass. 2015) (quoting Speakman v. Allmerica Fin. Life Ins., 367 F. Supp. 2d 122, 132 (D. Mass. 2005)). "[T]he plaintiff bears the burden of presenting evidence of bad faith or an absence of good faith." T.W. Nickerson, 924 N.E.2d at 706 (quoting 23 Williston on Contracts § 63.22 (R. Lord 4th ed. 2002)). As with other forms of breach, a claim for breach of the covenant of good faith and fair dealing also requires causation, Med. Air. Tech. Corp. v. Marwan Inv., Inc., 303 F.3d 11, 22 (1st Cir. 2002), and damages, see Sonoran Scanners, Inc. v. Perkinelmer, Inc., 585 F.3d 535, 545 (1st Cir. 2009).

According to Doe, the purpose of the May 19 Agreement was to safeguard his confidentiality and ensure that Boston College did not disclose information regarding his expunged charges or details regarding the one charge that remained on his record. [ECF No. 64 at 15]. He argues that Boston College breached the covenant of good faith and fair dealing by including in the Pre-Health Committee letter language that he repeatedly violated a university directive and also Doe's own explanation of his institutional action. [ECF No. 64 at 13]. Doe contends that Professor Taghian's modifications to the Pre-Health Committee letter during the next two application cycles to delete this language and remove negative references to Doe's disciplinary record and social difficulties, show that Boston College understood that the language violated the May 19 Agreement and supports the inference that their current interpretation of the scope of the May 19 Agreement was created as a defense to this lawsuit. [ECF No. 64 at 13]. Further, he argues that Boston College acted in bad faith because Professor Taghian did not review the May 19 Agreement prior to including language about Doe's institutional action in his Pre-Health Committee letter. [ECF No. 64 at 14–15].

Boston College contends that the record shows that it responded to third party inquiries consistent with its obligations in the May 19 Agreement, [ECF No. 65 ¶ 51]; [ECF No. 65-36]; [ECF No. 65-37], and that Professor Taghian explicitly advised Doe regarding the risks of requesting a Pre-Health Committee letter and told him that he could apply to medical schools without a letter or with an independent letter of support, [ECF No. 65 ¶ 29]; [ECF No. 65-27]. The school also argues that there is no evidence of any dishonest purpose or conscious wrongdoing by Boston College in connection with the May 19 Agreement. [ECF No. 52 at 14].

Although it is a very close call given that the Pre-Health Committee letter was not solicited by a third party and Professor Taghian's warning about what information could be included in such a letter, viewed in the light most favorable to Doe, the Court concludes that there remains a dispute of material fact as to whether Boston College's actions with respect to the Pre-Health Committee Letter were contrary to the spirit of the May 19 Agreement. Even though the letter was written at Doe's request, and he was forewarned that it would include some brief commentary regarding his past conduct, a reasonable fact finder could conclude that the details provided in the letter were inconsistent with the "overall spirit" of the May 19 Agreement and did not "conform[] to the parties' reasonable understanding of [their] performance obligations." Shaulis, 120 F. Supp. 3d at 55.

With respect to causation, there also remains a dispute of material fact as to whether the alleged breach of the implied covenant of good faith and fair dealing caused Doe to be rejected from Temple SOM. Defendants argue that it is purely speculative that Doe was rejected by Temple SOM due to "isolated comments" in the Pre-Health Committee Letter, [ECF No. 52 at 17], and that several other factors, including Doe's poor interviewing and communication skills, could have impacted his rejections, [id. at 15–16]. In response, Doe claims that his rejection was

an immediate and foreseeable consequence of the Pre-Health Committee including the allegedly improper details in the letter. [ECF No. 64 at 16]. In support of this proposition, Doe points to Dr. Levin's testimony in which he stated that he understood "university probation" to signify that serious or frequent conduct violations had occurred, which he claims shows that Dr. Levin drew improper inferences and conclusions from the Pre-Health Committee Letter. [Id.].

Again, while the Court finds that Doe's arguments are very close to the border of plausibility, it is not out of the realm of possibilities that a reasonable fact finder could find that the language in the Pre-Health Committee letter materially impacted the Temple SOM admissions committee's decision to deny Doe's applications.

Finally, a material dispute also remains with respect to whether Doe has established that Boston College's alleged breach caused him damages. The "rule of damages in an action for breach of contract is that the plaintiff 'is entitled in general to damages sufficient in amount to compensate him for the loss actually sustained by him . . . He may not insist upon extraordinary or unforeseen elements of damages, but only such as flow according to common understanding as the natural and probable consequences of the breach.'" Pierce v. Clark, 851 N.E.2d 450, 454 (Mass. App. Ct. 2006) (quoting Boylston Hous. Corp. v. O'Toole, 74 N.E.2d 288, 302 (Mass. 1947)). "[D]amages cannot be recovered when they are remote, speculative, hypothetical, and not within the realm of reasonable certainty." Lowrie v. Castle, 113 N.E. 206, 210 (Mass. 1916).

In arguing that Doe has not shown any damages, Boston College first contends that Doe has failed to establish any damages because the report of his expert witness, Walstra, should be struck due to its unreliability. [ECF No. 52 at 19]. As discussed further above, Boston College's motion to strike Walstra's report has been denied in part with respect to his analysis regarding the economic impact of a two-year delay in attending medical school and of practicing as an

oncologist versus a family practitioner. Additionally, Boston College argues that Doe's alleged damages are not reasonably certain because Doe still has many "hoops he must jump through to obtain gainful employment" and it is impossible to determine any impact from the alleged breach on his future income at this point in time, both with respect to the specialty that he will practice and whether his two year delay in entering medical school will impact his total earnings. [Id. at 20–21].

Doe claims that there is no doubt he was damaged by delaying his career as a doctor, and that the question as to the amount of those damages is a question for the jury to resolve. [ECF No. 64 at 18–19]. The Court agrees that the question of damages remains a factual dispute for a jury to resolve. If, as Doe has alleged, Boston College's breach caused him a two-year delay in attending medical school, a decrease in earnings due to that delay is not unreasonable or speculative. Further, as explained in Professor Taghian's affidavit, the opportunities for MDs and DOs vary based on specialty. [ECF No. 55 ¶ 14]. As such, whether Doe incurred damages from Boston College's alleged breach, and the amount of those damages, remains a question for the jury. Boston College's motion for summary judgment on Count II is therefore **DENIED**.

## IV. CONCLUSION

For the reasons set forth above, Boston College's motion for summary judgment, [ECF No. 51], is **GRANTED IN PART** and **DENIED IN PART**. Boston College's motion to strike portions of Doe's statement of facts, [ECF No. 78], and Doe's motion to strike portions of the

affidavit of Professor Taghian, [ECF No. 60], are **DENIED**. Boston College's motion to strike Doe's expert report, [ECF No. 48], is **GRANTED IN PART** and **DENIED IN PART**.

**SO ORDERED.**

September 30, 2026

*/s/ Allison D. Burroughs*
ALLISON D. BURROUGHS
U.S. DISTRICT JUDGE